THE PEOPLE *ex rel.* Johnson *et al.*

*v.*

CHARLES E. GEORGE.

*Opinion filed June 21, 1900.*

1. ATTORNEYS AT LAW—*Governor's pardon does not restore "good
moral character."* An attorney who has been convicted of a felony
is subject to disbarment though he has been given a full pardon by
the Governor, since the pardon cannot restore the "good moral
character" which the statute requires shall be possessed by mem-
bers of the bar.

2. SAME—*when name of attorney will be stricken from the rolls.* The
name of an attorney will be stricken from the rolls on information,
where it is shown that the attorney has been convicted of a felony,
and that after being pardoned by the Governor he has been guilty
of practicing deceit and obtaining money by false pretenses.

INFORMATION for disbarment.

This is an information filed by the State's attorney
of Cook county, on the relation of five members of the
Chicago bar association, constituting a committee on
grievances of the said association, against Charles E.
George, the respondent, an attorney at law practicing
in the city of Chicago, asking for his disbarment.

The information shows that the respondent was ad-
mitted to practice as an attorney and counselor at law
October 22, 1894, according to the rules and customs of
this court and the laws of the State of Illinois, for and
during good behavior, and has ever since been engaged

in the practice of law in the county of Cook and State of Illinois. The information charges that on or about the 2d day of April, 1896, an indictment was duly returned to the criminal court of Cook county, charging the said Charles E. George with embezzling and converting to his own use the sum of $200, which had come into the possession of the said George by virtue of his employment as an attorney for one Tillie Cutta; that on or about the 24th day of December, 1896, the said George was duly tried under said indictment and a verdict was rendered by the jury therein, finding the said George guilty of larceny in manner and form as charged in said indictment, and finding the amount so stolen to be $150; that thereafter, on or about the 15th day of January, 1897, the said George was duly sentenced by the criminal court of Cook county on the said verdict and ordered to be taken to the penitentiary of this State located at Joliet and there delivered to the warden of said penitentiary; that all of said acts of the said George were fraudulent, dishonest, scandalous and unprofessional, and were and are calculated to bring the courts of justice into disrepute and contempt and to tarnish the good name of the legal profession; that such acts were contrary to the duty of the said George as an attorney and counselor at law and contrary to the rules of this honorable court, and against the peace and dignity of the People of the State of Illinois. The information prayed for a rule on the respondent to show cause why his name should not be stricken from the roll of attorneys of this court.

The respondent filed his sworn answer, admitting that at the December term, 1896, of the criminal court of Cook county he was convicted of a felony,—of the crime of embezzlement; that a motion for a new trial was entered before his honor, Judge Sears, which motion was overruled and judgment thereupon entered upon the verdict and sentence pronounced accordingly, to reverse which judgment a writ of error was sued out, which was made

a *supersedeas,* but upon the hearing the judgment of the criminal court was affirmed and a motion for a rehearing afterward overruled.    Respondent also sets up that two affidavits were afterwards presented to the board of pardons for the State of Illinois, purporting to be newly discovered evidence on the part of respondent, both being of such effect, as respondent claimed, as to establish his innocence, and that upon the showing made and evidence furnished the board of pardons made a recommendation to the Governor of the State of Illinois, and that, acting upon such recommendation, the said Governor, upon the 19th day of December, 1897, issued to respondent a full and unconditional pardon, thereby restoring to him all of the rights to which he had at any time before been entitled to or enjoyed as a good and reputable citizen of the State of Illinois; asks that the rule entered April 6, 1899, upon the information, may be discharged and that the court may find that respondent has made a proper showing, and that he be not disbarred as prayed for on the part of the People.

A supplemental information was filed by the State's attorney of Cook county, charging that respondent unlawfully and falsely, on or about the 10th day of March, 1899, pretended to one William Lister that one Chris Riedel was then dead, and that Lena Riedel, his wife, needed and desired the sum of $10 in money with which to purchase a bonnet and some crape for her use at the funeral of said Chris Riedel, and that said Lena Riedel then needed and desired the further sum of $15 with which to pay a certain bill then due to Dr. Barrow for medical attendance upon said Chris Riedel during his lifetime, which false pretenses were made by respondent to Lister to induce Lister to sign a check for $25, which Lister did sign and deliver to respondent, and respondent procured $25 in money thereon and appropriated the same to his own use; that said Chris Riedel was not dead but was living, as was well known to respondent, and

that Lena Riedel was not a widow and was not in need of money for the purposes above set forth; that for this crime an indictment was returned to the criminal court of Cook county and is now pending.

Respondent filed an amended sworn answer to the original information, denying every charge of unprofessional conduct as a lawyer, and also answered the supplemental information, denying the charges of obtaining money of William Lister by false pretenses. Testimony was taken by the State's attorney in support of the supplemental information, being the same that will be presented on the trial of the indictment for false pretenses.

CHARLES S. DENEEN, State's Attorney, (FRANK ASBURY JOHNSON, and FRANK J. SMITH, of counsel,) for relators.

WILLIAM E. HUGHES, and R. A. WADE, for respondent.

Mr. JUSTICE CRAIG delivered the opinion of the court:

The offense charged in the original information against the respondent was embezzlement and larceny. The record of the criminal court of Cook county, duly certified, was attached to and made part of the information. This record shows that on the 2d day of April, 1896, an indictment was duly returned to the criminal court of Cook county, Illinois, charging the respondent, Charles E. George, with embezzling and converting to his own use $200 which had come into his possession by virtue of his employment as an attorney for one Tillie Cutta; that on or about the 24th day of December, 1896, the respondent was duly tried under the indictment, and a verdict was rendered by the jury finding respondent guilty of larceny and finding the value of the property stolen to be $150, and on the 15th day of January, 1897, he was sentenced to the State penitentiary at Joliet. The case was brought to this court by writ of error to the criminal court of Cook

county, and the judgment affirmed. The record established the guilt of the respondent of the crime with which he was charged, and it is admitted by the respondent's answer. The respondent sets up in his answer that the board of pardons made a recommendation to the Governor of the State of Illinois, and that, acting upon such recommendation, the Governor issued a full and unconditional pardon, restoring to him all of the rights to which he had before been entitled. The question is, whether, under these undisputed facts, the respondent, Charles E. George, is a proper person to retain his license as an attorney of this court.

A good moral character is required by the statute of this State and the rules of this court before a person is entitled to receive a license to practice as an attorney and counselor at law. If a good moral character is a condition precedent to his receiving a license as an attorney, is it not implied that he shall continue to possess a good moral character if he would retain his license? This court has discretion to strike the name of any attorney or counselor at law from the roll of attorneys for malconduct in his office. What constitutes mal-conduct must depend upon the facts in the particular case. What effect did the conviction of the respondent of the crime of larceny and his sentence to the penitentiary have upon his moral character?

Paragraph 277 of the Criminal Code (Rev. Stat. 1874, p. 394,) defines a felony as follows: "A felony is an offense punishable with death or by imprisonment in the penitentiary." Paragraph 74 defines embezzlement: "Whoever embezzles or fraudulently converts to his own use, or secretes, with intent to embezzle or fraudulently convert to his own use, money, goods or property delivered to him, which may be the subject of larceny, or any part thereof, shall be deemed guilty of larceny." (Ibid. p. 362.) Paragraph 168 provides: "Every person convicted of larceny, if the property stolen exceeds the value

of $15, shall be imprisoned in the penitentiary not less than one nor more than ten years," etc. (Ibid. p. 377.) Paragraph 279 provides: "Every person convicted of the crime of murder, rape, kidnapping, willful and corrupt perjury, * * * incest, larceny, forgery, counterfeiting or bigamy, shall be deemed infamous, and shall forever thereafter be rendered incapable of holding any office of honor, trust or profit, of voting at any election, or serving as a juror, unless he is again restored to such rights by the terms of a pardon for the offense, or otherwise according to law." (Ibid. p. 394.) Section 13 of article 5 of the constitution provides: "The Governor shall have power to grant reprieves, commutations and pardons, after conviction, for all offenses, subject to such regulations as may be provided by law relative to the manner of applying therefor." (Ibid. p. 67.) Paragraph 49 of chapter 108, entitled "Penitentiary," provides: "The Governor shall have the right to grant any convict that has been, now is, or may be hereafter confined in the penitentiary, whom he shall deem a proper person to enjoy that privilege, a certificate of restoration to all his rights of citizenship, as provided by law," etc., and the legislature has prescribed the manner of applying therefor. (Ibid. p. 770.)

The offense of which respondent was convicted was, under the statute, infamous, and his conviction for larceny and his sentence to the penitentiary for a felonious offense had the effect to degrade him, and established not a good but a *bad* moral character. The pardon set up in respondent's answer restored him, so far as the power of the Governor could, "to all his rights of citizenship, as provided by law." The rights of citizenship he had forfeited by his conviction of an infamous crime were, that he was "rendered incapable of holding any office of honor, trust or profit, of voting at any election, or serving as a juror." (See par. 279, *supra.*) The pardon of the Governor restored respondent to all the rights he

had forfeited by the conviction of the crime of larceny, and he was released from serving his term of imprisonment,—was relieved from the punishment the law inflicted for the offense. But the pardon could not efface the moral turpitude involved in the crime. It could not obliterate the moral stain upon his character. That remains.

In *Penobscot Bar* v. *Kimball*, 64 Me. 146, the court says: "In order to fit him for this trust the possession of a character fortified by high moral principle is indispensable. The statute makes a 'good moral character' a condition precedent to his admission to the bar. By his admission the court hold him out to the public as worthy of public confidence and patronage. Upon this endorsement by the court the public have a right to rely, and to presume that his moral character continues to stand approved by the court. If a 'good moral character' is indispensable to entitle one to admission to the bar, it is obvious that the necessity for its continuance becomes enhanced by the conflicts, excitements and temptations to which the practitioner is daily liable. For his official misconduct there is no power of removal but in the court. This power, therefore, is at once necessary to protect the court, preserve the purity of the administration of justice and maintain the integrity of the bar." On page 149 the court says: "Upon passing from the law to the facts in the case before us, we find that the first specification relied on to establish the general charge that 'the respondent does not possess a good moral character' is proved. He was sentenced to confinement and hard labor in the State prison for the term of two years, as charged in the motion. The crime for which he was convicted and sentenced was the forgery of a deposition, and caption thereto annexed, which were offered in evidence by him and admitted by the court on the trial of a libel for divorce brought by him against his wife. But we further find that he has been pardoned by the executive for that offense. The effect of that pardon is, not only to release

the respondent from the punishment prescribed for that offense and to prevent the penalties and disabilities consequent upon his conviction thereof, but also to blot out the guilt thus incurred, so that in the eye of the law he is as innocent of that offense as if he had never committed it. The pardon, as it were, makes him a new man in respect to that particular offense and gives him a new credit and capacity. To exclude him from the office he held when he committed the offense is to enforce a punishment for it notwithstanding the pardon. * * * The executive pardon affords no protection from the consequences which the law attaches to this offense. Pardon for one crime does not release a party from the penalties and disabilities consequent upon the commission of another. A pardon for forgery does not prevent a party from suffering the consequences attached to a conviction for adultery or larceny, nor blot out the guilt inseparable from such crimes and give their perpetrator a new character for chastity and honesty. The indictment upon which the respondent was convicted contains no count for a violation of his official oath or for a fraud upon the court. The respondent's pardon for forgery can no more obliterate the stain of guilt for those offenses than the judgment in that case would be a bar to an indictment for their commission."

In *Baum* v. *Clause*, 5 Hill, (N. Y.) 196, Bronson, J., said: "Pardon removes the legal infamy of the crime, so that the offender will be a competent witness, but it cannot take away guilt or wash out the moral sin."

A supplemental information was filed in the case at bar, which charged the respondent with knowingly and designedly and fraudulently pretending that one Chris Riedel was dead, and that Lena Riedel was his widow and needed and desired the sum of $10 in money with which to purchase a bonnet and some crape for her use at the funeral of Chris Riedel, and also needed the sum of $15 in money to pay a doctor's bill then due Dr. Bar-

186—9

row for medical attendance upon Chris Riedel during his lifetime, which false pretenses were made by respondent to Lister for the purpose of inducing Lister to give respondent a check for $25 payable to the order of respondent, and respondent procured $25 thereon and unlawfully appropriated the money to his own use; that on the 27th day of May, 1899, an indictment was returned to the criminal court of Cook county, which is now pending and undetermined. It appears from the evidence that the check was made March 10, 1899, and shortly before this, while riding and driving in a buggy with James O'Donnell, a saloon-keeper, Lister ran against one Chris Riedel and injured him. Afterwards one Schurtz made a claim for damages, and Lister met him and respondent at O'Donnell's saloon, near the Criminal Court building, in Chicago, but Lister refused to recognize Schurtz and gave respondent $25 with which to make a settlement with Riedel. Respondent testifies himself that he called at Riedel's house, 83 Uhlan street, where he found Riedel in bed; that he stated that he had come there from Lister for the purpose of making an adjustment, if he could; that he said to him that Lister was a man of wealth, and generous; that he had no desire for a damage suit, if one was likely to be brought; that his wife then spoke up and said she thought $10 would settle the matter; that he gave $15 to the wife and took a receipt, dated December 31, 1898. Chris Riedel testifies that respondent told him that Lister said he could get all he wanted, and sent him $15 so he could get something to eat for his family, and that he had no dealings with Schurtz. Lena Riedel testifies that respondent said: "Lister sent me with $15 so you get something to eat in the house; so you can walk; go over to the office, get so much as you want more." The receipt was for one dollar and other valuable considerations, and discharged and released all claims for damages, injuries or any other claims he (Riedel) might have against William Lister, or his heirs or as-

signs. The principal charge in the supplemental information is, that *after* this he fraudulently procured a check for $25 and converted it to his own use.

William Lister testifies that on March 10, 1899, respondent came to his office about half-past nine o'clock and read the following letter:

"CHICAGO, *March 9, 1899.*

"*Charles E. George, 160 Washington Street, Chicago:*

"On the part of Chris Diehl, late of 15 Ulm street, I beg to notify you that her husband died yesterday as the result of injuries received in an accident with William Lister on December 22, last. The acting physician, Dr. Barrow, says there can be no doubt of his having received internal injuries which led to his death. The wife recognizes the fact of your having settled with him on account of Mr. Lister, but you will observe that settlement cannot be binding on the wife or children, who could undoubtedly compel Lister to pay a large sum in damages. The wife believes if Mr. Lister will assist in defraying the funeral expenses and settling the doctor's bill, which amounts to about $25, she will execute a release in full. This matter should be attended to at once, else the case will be placed in the hands of our chief counsel for suit. Immediate action on your part is necessary.

"Yours truly,      ABBIE S. SCHENLEY,
*Bureau of Law and Justice, Hull House Terrace.*"

And respondent said he thought the settlement would hold, and thought there was probably no doubt about it. Lister testified further: "He said he would settle that for a matter of probably $25; that he had found all this widow required was a bonnet and some crape and make a settlement with the doctor. I, of course, said that I did not wish any trouble with it, and if it was going to do the widow any good with $25 I certainly would allow that amount, and I went and wrote respondent a check, payable to his order, for the $25. Respondent told me the body was over at Burmeister's, on Larrabee street. Burmeister is an undertaker." Witness says he saw respondent again at two o'clock in the afternoon at James O'Donnell's saloon and spoke to him about the release or

receipt, and respondent said that he would mail or had mailed it. He further says that when he next met respondent he told respondent that he had received the letter, and respondent said he was sorry, and that somebody had mixed him into that matter. Lister testifies that he had no transaction with any one by the name of Chris Diehl, and that his only transaction of that nature was with Chris Riedel. Respondent admitted having the check and having it cashed; that he asked James O'Donnell to get it for him. Lister testifies that "the giving of that check was to settle that claim," and that respondent was positive he could settle it for $25.

The falsity of the representations made by respondent is too apparent. The only person injured by Lister was Chris Riedel, and he was the only man Lister had any transaction with of that nature. He had nothing to do with any person by the name of Chris Diehl. The first person to make any demand or claim of Lister was a notary named Schurtz. Respondent testifies the man's name was Schwartz; that he did not inquire of Abbie S. Schenley where the Bureau of Law and Justice was located or where Hull House Terrace was; that he has made inquiry and cannot learn where it was, and that there is no such place in the city of Chicago and State of Illinois as Hull House Terrace; that he did not inquire of her for her authority to represent Chris Riedel's widow; that he took a personal receipt from Abbie S. Schenley that he settled the claim; that he took it in the name of Diehl—not in the name of Riedel. He states he believes she was the same woman who was arrested two weeks later for robbing Lister; that he believes she is the same party. The record also shows that respondent stipulates that the record may show that the city directories from 1880 to the present time do not contain the name of Abbie S. Schenley, the Bureau of Law and Justice or Hull House Terrace. The record also shows that Chris Riedel was not dead, but was present and testified; that Riedel does

not know Dr. Barrow or Abbie S. Schenley, or any one connected with the Bureau of Law or Justice or Hull House Terrace. His wife, Lena Riedel, testifies that she does not know either of them, and never had any dealings with the Bureau of Law and Justice; that she never said to respondent that "I needed some money for crape or a bonnet to go to my husband's funeral."

It is impossible to read this testimony in support of the supplemental information without being impressed with the guilt of the respondent of the charge of obtaining the money of Lister, his client, under false pretenses. He knew that Chris Riedel was the name of the person who had been injured by Lister while driving with O'Donnell, and that he had settled the supposed claim. He knew the name was not Diehl, and respondent's testimony shows that the name "Abbie S. Schenley" and the name "Bureau of Law and Justice, Hull House Terrace," were fictitious. He used the letter to impose upon his client and obtain his money. The respondent having been convicted of a felony, as charged in the original information, notwithstanding the pardon does not possess such a "good moral character" as the statute requires and the purity of the bar demands of its members. Notwithstanding his release from the punishment for the crime of larceny by a pardon in December, 1897, we find respondent, within two years thereafter, practicing deceit and obtaining money of his client, Lister, by false pretenses. We are satisfied that respondent is not a proper person to retain the license as an officer of this court.

It is therefore ordered that the rule be made absolute, and that the name of Charles E. George be stricken from the roll of attorneys in the State of Illinois.

*Rule made absolute.*