IN RE MEYERSON

[No. 145, October Term, 1947.]

674

*Decided May 27, 1948.*

The cause was argued before MARBURY, C.J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Bernard M. Goldstein* for the appellant.

*William R. Semans* and *Paul F. Due* for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from an order of the Supreme Bench of Baltimore City denying an application of a disbarred lawyer for reinstatement. Code 1939, Art. 10, secs. 22, 17.

Whether the Legislature could compel the courts to reinstate a pardoned convict or any other disbarred

lawyer if he is not in fact a proper person to be permitted to practice, is a question not presented. The Act of 1937, ch. 370, (Art. 10, sec. 22) purports to require reinstatement only if the court shall be satisfied that the applicant is "worthy of reinstatement." Art. 10, sec. 3, authorizes admission to practice only if this court shall find the applicant "to be of good moral character and worthy to be admitted;" this court shall prescribe "generally such * * * rules as may be necessary or convenient to carry out the provisions of this section." This court has prescribed rules providing, among other things, for Character Committees to investigate each applicant's "moral character qualification for Bar membership" and to make "their recommendation as to the character and fitness of the applicant to be admitted to the Bar". The requirements that an applicant for original admission to practice shall be "of good moral character and worthy to be admitted" and an applicant for reinstatement after disbarment shall be "worthy of reinstatement" are expressions of the same principles with respect to different facts, which require different evidence. Both are the converse of the statutory grounds of disbarment, "professional misconduct, malpractice, fraud, deceit, crime involving moral turpitude, or conduct prejudicial to the administration of justice". Art. 10, secs. 16, 17. In all these respects, "the statute has done but little, if anything, more than enact the general rules upon which the courts of common law have always acted." *Ex parte Secombe,* 19 How. 9, 14, 15 L. Ed. 565 (*per* Taney, C. J.), quoted in *Rheb v. Bar Association of Baltimore,* 186 Md. 200, 203, 204, 46 A. 2d 289, 291.

"The question is, whether, after the conduct of this man, it is proper that he should continue a member of a profession which should stand free from all suspicion. * * * It is not by way of punishment; but the court, in such cases, exercise their discretion whether a man whom they have formerly admitted is a proper person to be continued on the roll or not." *Ex parte Brownsall,* 1778, 2 Cowp. 829 (Lord Mansfield), quoted in *Ex parte*

*Wall,* 107 U. S. 265, 273, 2 S. Ct. 569, 27 L. Ed. 552, and in *Rheb v. Bar Association of Baltimore, supra,* 186 Md. at page 205, 46 A. 2d 289, 291. The requirement that an applicant for admission be of "good moral character", and the fact that of the six statutory grounds of disbarment only the first two (tautological) grounds are limited to professional, as distinguished from personal offenses, illustrate the breadth of Lord Mansfield's statement and of the later authorities applying various statutory provisions which are elaborations of his brief statement. The next three grounds of disbarment indicate lack of "good moral character", necessary to be "worthy to be admitted"—not mere "indulgence in what might be termed the minor vices, of a purely personal character", which "does not amount to professional misconduct". *Rheb v. Bar Association of Baltimore, supra,* 186 Md. at page 204, 46 A. 2d 289. "Conduct prejudicial to the administration of justice" may include a criminal offense which impairs the basic objects of a lawyer's profession, though not committed in his professional capacity, and though he has not been convicted or indicted, *e. g.,* lynching. *Ex parte Wall,* 107 U. S. 265, 2 S. Ct. 569, 27 L. Ed. 552.

Appellant cites cases from many jurisdictions, as holding that disbarment does not in all circumstances forever prevent reinstatement under inherent or statutory powers of the courts. We see no reason to question this generalization. In some jurisdictions it is held that on a proper showing a disbarment order may be set aside; in some, that this cannot be done but reinstatement may be affected as a new admission to practice (*In re Boone,* C. C., 90 F. 793) and may even be subject to procedural requirements (*e. g.,* reference to committees or bar examinations) of an original application for admission. *In re Keenan,* Petitioner, 310 Mass. 166, 37 N. E. 2d 516, 137 A. L. R. 766; *State v. Gowland,* 174 La. 351, 140 So. 500; *In re Stevens,* 59 Cal. App. 251, 210 P. 442. In Maryland, by statute, original applications are made to this court. Art. 10, sec. 2. Under the Act of 1937 applica-

tion for reinstatement must be made to the court which issued the disbarment order, and "the provisions \* \* \* relating to hearing and appeals in proceedings for \* \* \* disbarment shall be applicable to proceedings for reinstatement \* \* \*". The Act of 1937 is applicable only to pardoned convicts, but by implication, we think, the same procedure is applicable to other disbarred lawyers. In the absence of any rule on the subject under Art. IV, section 18A of the Constitution (effective January 1, 1945), we have no doubt as to the validity or application of these different provisions for original applications and applications for reinstatement. It is not inconsistent for original applications for admission, usually uncontested, to be made to this court and disbarment and reinstatement proceedings to be conducted in the local courts. The provision for hearing in open court and the opportunity of the judges (some of whom may have heard the disbarment proceedings) to see and hear the witnesses is a substitute for reference of an application for reinstatement to the State Board of Law Examiners and the Character Committee, and gives weight on appeal to the decision of the lower court.

Whether an application for reinstatement is called an application to set aside a disbarment order or an application for admission to practice, its essential nature is the same. "A subsequent petition for admission to the bar involves a new inquiry as to whether, in the interval following the rendering of the judgment of removal, the petitioner has become a proper person to hold such office." *In re Keenan, Petitioner, supra,* 310 Mass. at page 170, 37 N. E. 2d at page 519. Such an inquiry is directed to the facts of the particular case, but seems to be approached in a somewhat different attitude in different jurisdictions. *In re Stump,* 272 Ky. 593, 597, 114 S. W. 2d 1094, 1096, the court classified the many decisions as establishing three rules, a "lax rule", a "strict rule", and a "reasonable middle rule." It would serve no useful purpose to review the multitude of cases

in different jurisdictions. Some cases, we think, do reflect a "lax rule" which is not consistent with the principles, regarding admission and disbarment, shortly stated by Lord Mansfield, expanded in the Maryland statutes and applied in rules of this court and in decisions of this court and the Supreme Court. As disbarment is not punishment, likewise we think due regard for the administration of justice does not permit disbarment and reinstatement to be made mere adjuncts to reform schools and the parole system. The authorities that seem to us the best considered take a different view, which is consistent wtih the principles recognized in Maryland.

*In Matter of Kaufmann,* 245 N. Y. 423, 427, 157 N. E. 730, 731, it was held that after a lawyer, automatically disbarred upon conviction of a felony (in that case, conspiracy against the United States), has been pardoned, he may, if he can, upon application for reinstatement, prove his innocence of the crime of which he was convicted. Chief Judge Cardozo said: "Precedents cited to the contrary hold no more than this, that reinstatement will *not* follow automatically from pardon without more. *People ex rel. Johnson v. George,* 186 Ill. 122, 57 N. E. 804. There must be convincing proof of innocence before pardon will restore to the fellowship of the bar. Even innocence of crime will not suffice if there has been a failure to live up to the standards of morality and honor. Pardon does no more than open the door to an inquiry that would otherwise be barred. That much, however, it does." 245 N. Y. at page 430, 157 N. E. at page 733. It was apparently undisputed that nothing short of innocence of the particular crime involved in that case would justify reinstatement. Attorney General (later Chief Justice) Stone's recommendation of pardon to the President was based on belief in innocence. In the same case Judge Cardozo also said: "No doubt the attorney seeking reinstatement has the burden of satisfying the court of his fitness to be restored to so honorable a fellowship. For the welfare and repute of the

profession the order of disbarment stands until the presumption of its correctness has been persuasively rebutted." 245 N. Y. at pages 428, 429, 157 N. E. at page 732. · The Supreme Judicial Court of Massachusetts has recently said: "A judgment of removal of a person from his office of attorney at law does not have the effect merely of removing him. It amounts to an adjudication of the facts upon which the removal was based. While the judgment remains unreversed the adjudication of facts stands against the person removed. It is evidence against him upon his subsequent petition for admission to the bar. [Citing cases.] It is conclusive of his lack of moral character at the time of his removal from office. And it continues to be evidence against him with respect to lack of moral character at later times in accordance with the principal that 'a state of things once proved to exist may generally be found to continue.' [Citing case.] Whatever the offense for which a judgment of disbarment was entered, the person disbarred has a heavy burden on a subsequent petition for admission to the bar to overcome by evidence the weight of the facts adjudicated by such judgment and to establish affirmatively that since his disbarment he has become 'a person proper to be held out by the court to the public as trustworthy' ". *Matter of Keenan,* 313 Mass. 186, 219, 47 N. E. 2d 12, 32. The Supreme Court of Louisiana has said: "It may well be assumed, therefore, that the Court has the inherent power, under such rules as the Court may deem proper, to revoke the decree of disbarment and reinstate the attorney in his license to practice law. But the Court would not be disposed to exercise that power, no matter how sympathetic the members of the Court might be, unless perhaps, on being convinced that an error was committed, or an injustice done, in rendering the decree of disbarment. There is no such showing in this case." *In re Wolff,* 173 La. 257, 136 So. 583, 584. In *State v. Gowland,* 174 La. 351, 140 So. 500, on an application for reinstatement twenty years after conviction of forgery, on a plea of guilty, disbarment and pardon,

the court manifested somewhat greater disposition to exercise the power to reinstate, holding that under applicable statutes the question whether the applicant could qualify for readmission should first be taken up by the examining committee.

Appellant was admitted to the Bar in 1936 and began practice in Baltimore. He was then 22 years old. In December, 1939 he was appointed a special assistant to the Attorney General in the trial of tax cases, in the Department of Justice. In April, 1937 he met a young married woman (now his wife), who was then 17 years old. In February, 1940 he filed for her a bill for a divorce, which was granted in May, 1940. In August, 1941 she became pregnant by him and told him her condition. "Just prior thereto" or "in the fall of 1941" he announced his engagement to another woman. In January, 1942 an abortion upon the divorced woman was effected at the house of a midwife, where she stayed eight days. The day after the child was born dead she ran out of the house, the midwife after her, got a taxi and went to her sister's. A surgeon was called, found her very ill, and sent her to Mercy Hospital, where she stayed more than a month, until February 15th. Appellant told the surgeon that although he did not think he was responsible for her condition, he was willing to take care of the hospital expenses. *Meyerson v. State,* 181 Md. 105, 112, 28 A. 2d 833. On February 21st she went to the State's Attorney's office and talked to the Deputy State's Attorney and an Assistant. She testified before the grand jury. On March 5th appellant, his father and the midwife were presented, and on March 13th indicted, for causing, and conspiring to cause, an abortion upon her.

On March 27, 1942 all three defendants were tried before Judge Smith, without a jury, and found guilty. At the trial the "prosecuting witness" testified that she had been "going with" appellant for five years; she did not see appellant at the midwife's house at any time, he was not at the house; she "loved the father of the baby

and wanted to have the baby"; appellant did not at any time say to her that he didn't want her to have the baby, he wanted her to have this baby; appellant's father took her to the midwife's house "for a rest for a few weeks"; appellant, after he learned she wanted to have the baby, never discussed with her any disposition of the affair other than for her to have the baby, and then he decided if she wanted to, she should. The State, to show surprise, offered to examine the witness about her testimony before the grand jury. Counsel for the witness, appointed by the court at this stage, advised her that this testimony might incriminate her. His objection was sustained. *Meyerson v. State, supra,* 181 Md. at page 107, 28 A. 2d 833. She admitted, however, that at the State's Attorney's office she had told the State's attorneys that appellant suggested "I have an abortion and that he took me to see several abortionists," and also had told them of an occasion when appellant was in the midwife's house while she was there. This testimony was admitted, not to impeach the witness or as affirmative evidence, but only to show surprise. Her testimony, on its face, exonerated appellant, incriminated his father and the midwife, and suggested, not very convincingly, that the abortion had been perpetrated upon her by deceit. The midwife testified that appellant brought the woman to the house and was there every day while she was there. Another witness, who had been employed in the same office with the "prosecuting witness," testified that she had discussed the woman's pregnancy with appellant and he had said he had obtained her divorce and "had gone with her" five years but "didn't love her". Appellant did not testify.

Appellant filed a motion for a new trial on the ground, among others, that he had been found guilty on the uncorroborated testimony of an accomplice, the midwife. On April 20, 1942 the motion was overruled by an equally divided court, though the order, signed by all the eight judges who sat, according to the practice then followed, did not show division among the judges. On April 21,

1942, however, appellant filed a motion for reargument on the ground, among others, that there was believed to be a division among the judges. On April 23, 1942 he married the "prosecuting witness". On May 11, 1942 the motion for reargument was overruled by the same judges, by an equally divided court. Motions in arrest of judgment, to strike out the verdict and to strike out judgment and sentence, filed on May 13, 1942, were overruled. *Meyerson v. State, supra,* 181 Md. at pages 107, 110, 28 A. 2d 833. On May 13, 1942 each of the defendants was sentenced to six months imprisonment. Appellant alone appealed. On November 18, 1942, the judgment was affirmed, this court holding, *inter alia,* that the sufficiency of corroboration of testimony of an accomplice is not reviewable on appeal. *Meyerson v. State, supra,* 181 Md. at page 111, 112, 28 A. 2d 833.

Appellant entered the House of Correction on December 10, 1942. On February 15, 1943 he was released by the court on probation for one year; on July 15, 1943, the probationary period was terminated by order of court. As a result of his conviction he was classified by his draft board in Class 4-F and was refused induction into the Army. On June 9, 1943 he wrote his draft board, asking reclassification and to that end a request by the board for his release from civil custody, and expressing his willingness again to volunteer for induction and his intention not to claim deferment for an essential occupation in the employment of Bethlehem Steel Company. As the result of his own efforts, he was inducted into the Army in September, 1943, entered active service the next month, served chiefly on the Italian front, received three battle stars and other decorations, became staff sergeant, and received his honorable discharge on December 20, 1945. On December 30, 1944 the Governor granted him a pardon.

On February 13, 1943 appellant was disbarred by the Supreme Bench after "hearing upon citation * * * to show cause why he should not be disbarred and answer thereto." The transcript contains five opinions

or memoranda of judges, but nothing else, in the disbarment proceeding. No appeal was taken from the disbarment order. Apparently the case was heard on the record in the criminal case, without any new testimony. Ten judges sat, including the eight who sat on the motion for a new trial in the criminal case and also Judges O'Dunne and Smith. Six judges voted for disbarment, two for "a year's suspension", one for "a reasonable suspension", and one against disbarment without suggesting any other action at all. Chief Judge Dennis, in an opinion concurred in by Judges Dickerson and Sayler, reviewing authorities and facts at length, held that causing, and conspiring to cause, an abortion are "crimes involving moral turpitude", that in appellant's case there were not mitigating but aggravating circumstances, and that he should be "disbarred for life". Judge Niles, in a short opinion concurred in by Judges McLanahan and Smith and also Chief Judge Dennis, held that the definition of moral turpitude is wide and can be interpreted to embrace either or both of the crimes in question, that if appellant were applying for original admission to the bar, he felt sure the convictions would prevent his admission, and that the circumstances of the crimes "show him clearly to be a person of such character that he is not fit for the practice of law," and he should therefore be disbarred. Judges Frank and Ulman, in a brief memorandum, expressed their opinion that one year's suspension would be appropriate and their concurrence in Judge Solter's opinion. Judge Solter, in a more extended opinion, held that "a reasonable suspension would be sufficient for the necessary vindication of the integrity of the courts." He accepted appellant's conviction as conclusive of guilt, but in the fact that four of the eight judges who heard the motion for a new trial had held that the evidence of guilt was legally insufficient, and that this question was not reviewable on appeal, he found mitigating circumstances, at least to a judge who had so held. He pointed out that this case showed that "by the procedure

684

in Maryland, a defendant has not the safeguard accorded in practically all jurisdictions, of demanding an instructed verdict at the close of the State's case." Judge O'Dunne, in a full opinion on the law and the facts, disclaimed contending that abortion is not a crime or does not involve moral turpitude, but held that appellant's crimes did not "so far affect him in his professional capacity as to warrant his disbarment."

On January 8, 1946, appellant's petition for reinstatement was filed, on April 2, 1946 an answer of the Bar Association "in pursuance of the suggestion of the Supreme Bench that said Association might desire to answer the petition", and on September 17, 1947 a reply by appellant to the answer. On September 20, 1947 the application for reinstatement was heard before a full bench, testimony was taken and an order was filed, signed by seven judges, denying the application. No opinion was filed. The eleven judges include four who sat in the disbarment case, of whom one had presided at the trial of the criminal case and the other three had heard the motion for a new trial. All four signed the order, and had previously voted for disbarment.

At the hearing appellant testified that, among other things: The abortion was arranged for by his father, with his knowledge. "The truth of the matter is that when my wife became pregnant we had a discussion as to the best thing to do. We decided it would be better if she would have the child. As a result, I obtained an apartment for her in Washington, where she lived, and I paid all the bills. She went to a doctor there, and I also paid those bills. It was after that that my father and I had a discussion that we changed our plans, and we thought it best that she does not give birth to the child, and I talked it over with her and she also changed and she agreed to go to this certain place. I did not take her. I was employed at that time in the Department of Justice, and my father took her. I did not go to the house on two occasions while she was there, to see how things were going, and at one time I did learn that the method

of abortion was almost brutal, and I talked to her about it, and I told her I was fearful it may harm her very, very severely; and at one time I did call a taxicab to take her out of the house."

Appellant and his wife and other witnesses testified that they have two children and their marriage has been a very happy one. He says, "I felt that I had done my wife a grave injustice, of course, I have been very sorry for it ever since, and I have tried my best to repent and make up for all the bad things she has suffered as the result thereof, and I am happy to say that I believe I have accomplished that; she is very happy, she has two fine sons, and a very fine home, and I am also happy."

Appellant offered evidence of his Army record, showing efficiency rating "Superior", character rating "Excellent", and qualification to be an officer candidate for the reason, among others, "His legal training has given him a sound judgment and reasoning ability, which he has displayed in his present assignment." Mayor D'Alesandro and other character witnesses testified to his domestic life, character and ability and their willingness to trust him as a lawyer. Of these character witnesses only two are lawyers and none have had relations with appellant as a lawyer. Mr. Wolman, former Assistant State's Attorney, testified principally as a former National Commander of the Veterans of Foreign Wars and the President of the Jewish Big Brother League. In expressing the opinion that appellant possesses the necessary requirements of character to be a lawyer, Mr. Wolman said: "I base my opinion primarily on the fact that Mr. Meyerson's criminal acts were those of a more or less personal nature, rather than acts that would be committed while representing a client, or while representing a fiduciary agency, or even while representing the court, and therefore he had wronged himself rather than wronging a client who had placed trust and confidence in him." Weakness sometimes inherent in character testimony is illustrated by the fact that one of the character witnesses was the surgeon whom appellant had

told he did not think he was responsible for the woman's condition.

Mr. Wolman's opinion as to "moral character qualification for Bar membership" is substantially the same as Judge O'Dunne's. This opinion we could not adopt without doing violence to the letter and spirit of the disbarment statute and ignoring the apprisals of the crimes cf abortion and conspiracy by the Legislature (in imposing severe criminal penalties) and by this court. As we have said, professional misconduct (malpractice) constitutes two—not six—tautological grounds of disbarment. It does not include or limit "crime involving moral turpitude." The crimes of abortion and conspiracy cannot be classified among "the minor vices". *Rheb v. Bar Association of Baltimore, supra.* In *Board of Dental Examiners v. Lazzell*, 172 Md. 314, 321, 191 A. 240, 243, in which indecent exposure was held to be a crime involving moral turpitude, the court cited, among "offenses in which it was held there was moral turpitude," "charging woman with attempt to procure abortion," *Filber v. Dautermann*, 26 Wis. 518. *In re Weare*, [1893] 2 Q. B. 439, a solicitor convicted of renting properties owned by him, to be used as brothels, was held to be unfit to continue to be a solicitor.

However, if the question now before us were whether there is any serious risk that appellant may repeat the crime of abortion, or whether his Army record, domestic life and behavior in private occupations are insufficient to show such a change in "moral character qualification" as would overcome the unfitness shown by that crime, we do not say that either of these questions should be answered in the affirmative. But the question whether appellant has sustained the burden of proof of fitness is broader than these questions.

At the reinstatement hearing appellant's testimony showed conclusively, for the first time, (1) that he was guilty of the crimes of which he was convicted and (2) that his almost successful effort to escape conviction depended entirely upon (*a*) his own omission to testify

and (b) perjured testimony of the "prosecuting witness". He had a constitutional right to refrain from testifying; but he has no constitutional right to practice law. Even in a criminal case a defendant who testifies in his own behalf may be cross-examined as to his failure to testify at a previous trial. *Raffel v. United States*, 271 U. S. 4094, 46 S. Ct. 566, 70 L. Ed. 1054. If appellant had testified, his testimony would have excluded the doubt as to guilt, which in Judge Solter's opinion was a mitigating circumstance against disbarment, and would have confirmed the conclusion, as to unfitness, reached in the opinions of Chief Judge Dennis and Judge Niles.

This reinstatement application is not a criminal case, in which there is a charge against appellant to be proved beyond a reasonable doubt. He has the burden of proving fitness acquired since unfitness was established by the disbarment. The perjured testimony at the trial does not tend to prove fitness. We cannot suppose that this testimony was a surprise to appellant, as it was to the State. He does not say it was.

No "moral character qualification for Bar membership" is more important than truthfulness and candor. No menace to the administration of justice is more serious and prevalent than perjury.

The judges of the Supreme Bench saw and heard the witnesses at this reinstatement hearing, one of them had presided at the criminal trial, three had heard the motion for a new trial and four the disbarment proceedings. By their order they have in effect found that appellant has not become fit to be a lawyer. From the record we are unable to say that they were wrong in so finding.

*Order affirmed, with costs.*