42 A.3d 610

**In the Matter of Ira C. COOKE for Reinstatement to the Bar of Maryland.**

Misc. Docket AG No. 82, Sept. Term, 2007.

Court of Appeals of Maryland.

April 25, 2012.

654

M. Albert Figinski of Law Offices of Peter G. Angelos, Baltimore, MD, for petitioner.

Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland, for respondent.

Reargued before: BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and McDONALD, JJ.

BELL, C.J.

Ira C. Cooke, the petitioner, was convicted, following a jury trial in the Superior Court of California, of offenses, concededly involving fraud, deceit or misrepresentation. He appealed the judgments of conviction; however, while his appeal was pending, the Attorney Grievance Commission ("the Commission"), acting through Bar Counsel, rather than a Petition for Disciplinary or Remedial Action, pursuant to Maryland Rules 16–751(a)[1] and 16–771,[2] seeking the petitioner's immediate

---

1. Rule 16–751 authorizes the filing of petitions for disciplinary or remedial action. It provides:

   "(a) *Commencement of disciplinary or remedial action.*
   "(1) Upon approval or direction of Commission. Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.
   "(2) Conviction of crime; reciprocal action. If authorized by Rule 16–771(b) or 16–773(b), Bar Counsel may file a Petition for Disciplinary or Remedial Action in the Court of Appeals without prior approval of the Commission. Bar Counsel promptly shall notify the Commission of the filing. The Commission on review may direct the withdrawal of a petition that was filed pursuant to this subsection."

2. Rule 16–771, captioned "Disciplinary or remedial action upon conviction of crime," provides, as pertinent:

   "(b) *Petition in Court of Appeals.* Upon receiving and verifying information from any source that an attorney has been convicted of a serious crime, Bar Counsel may file a Petition for Disciplinary or Remedial Action in the Court of Appeals pursuant to Rule 16–751(a)(2). The petition may be filed whether the conviction resulted from a plea of guilty, nolo contendere, or a verdict after trial and whether an appeal or any other post-conviction proceeding is pending. The petition shall allege the fact of the conviction and include a request that the attorney be suspended immediately from the practice of law. A certified copy of the judgment of conviction shall be attached to the petition and shall be prima facie evidence of the fact that the attorney was convicted of the crime charged.
   "(c) *Temporary suspension of attorney.* Upon filing of the petition pursuant to section (b) of this Rule, the Court of Appeals shall issue

suspension from the practice of law, filed, along with the petitioner, a Joint Petition for Disbarment. In that joint petition, the petitioner consented to disbarment, thus conceding the appropriateness of both the proceeding and the agreed upon sanction. Subsequently, the Court of Appeal of California reversed the petitioner's convictions and, on remand for a new trial, the State of California dismissed the underlying charges. This Petition for Reinstatement followed. In it, the petitioner asks whether, where the criminal convictions on the basis of which he joined in filing a joint petition for disbarment and pursuant to which he was disbarred have since been reversed, the underlying charges dismissed on remand and not further pursued and he has, since his disbarment, become a proper person to practice law, he should be reinstated to the Bar of Maryland.[3] We shall hold that, under the circumstances *sub judice*, he should be and, accordingly so order.

---

an order requiring the attorney to show cause within 15 days from the date of the order why the attorney should not be suspended immediately from the practice of law until the further order of the Court of Appeals. If, after consideration of the petition and the answer to the order to show cause, the Court of Appeals determines that the attorney has been convicted of a serious crime, the Court may enter an order suspending the attorney from the practice of law until final disposition of the disciplinary or remedial action. The Court of Appeals shall vacate the order and terminate the suspension if the conviction is reversed or vacated at any stage of appellate or collateral review."

3. There is a degree of inconsistency in the question. If the petitioner's consent to disbarment were, indeed, premised on and conditioned on the underlying convictions, which he appealed, then there would be no remaining basis for the disbarment once the convictions were overturned and those charges were not further pursued. That would be true whether, or not, the petitioner has conducted himself in an exemplary manner. That was the emphasis of the petitioner's argument at the most recent oral argument. Without abandoning his rehabilitation argument, he analogizes his case to one in which an immediate, temporary suspension, pursuant to Maryland Rule 16–771(c), was obtained.

At the first oral argument, after which the Court was equally divided, as we shall see, the petitioner conceded that Rule 16–771(c) did not apply, although he argued that the result it counseled should also apply to his case. The approach at that argument was a more balanced one,

## I. Background

In Maryland, disbarment is not an immutable sanction, *In re Meyerson*, 190 Md. 671, 676, 59 A.2d 489, 491 (1948); *see In re Murray*, 316 Md. 303, 304, 558 A.2d 710 (1989); *In re Cory*, 300 Md. 177, 180, 477 A.2d 273, 274 (1984); *In re Braverman*, 271 Md. 196, 199–200, 316 A.2d 246, 247 (1974); *Maryland State Bar Ass'n v. Boone*, 255 Md. 420, 433, 258 A.2d 438, 444–45 (1969); indeed, this Court has been clear, it "does not in all circumstances forever prevent reinstatement ..." *Meyerson*, 190 Md. at 676, 59 A.2d at 491. This is so, consistent with our expressed belief "that a fallen lawyer may rise again," *Murray*, 316 Md. at 305, 558 A.2d at 711 (quoting *In re Barton*, 291 Md. 61, 64, 432 A.2d 1335, 1336 (1981) (*Barton II* )), "even one who has committed a most heinous crime." *In re Raimondi and Dippel*, 285 Md. 607, 617, 403 A.2d 1234, 1239 (1979), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 705, 62 L.Ed.2d 669 (1980). Demonstrating one's entitlement to be reinstated to the practice of law is no simple or easy task, however. *Murray*, 316 Md. at 305, 558 A.2d at 710–11; *Barton II*, 291 Md. at 64, 432 A.2d at 1336. In *Murray*, we explained that, when presented with the issue of reinstatement, the Court examines the attorney's reformation following his disbarment, his competence as a lawyer, and from the results of these examinations, determines whether the "fallen lawyer may rise again." 316 Md. at 304, 558 A.2d at 710 (quoting *Barton II*, 291 Md. at 64, 432 A.2d at 1336). In *Barton II*, we noted that the prerequisite to reinstatement is a showing of "a clear and demonstrated change from what [the disbarred lawyer] was before[,]" 291 Md. at 64, 432 A.2d at 1336; therefore, we explained, "[w]e ... look probingly at any reapplication alleging reform, rehabilitation and competence," aware that "disbarment ... may only be overcome by a clear and convincing showing of rehabilitation and of legal competence, borne out by an applicant's conduct over a long period of time." *Id.* at 67, 432 A.2d at 1338. *See Cory*, 300 Md. at

with at least as much emphasis being directed to the petitioner's post-disbarment conduct.

180, 477 A.2d at 274. Thus, before ordering reinstatement, the Court must answer in the affirmative the fundamental inquiry, "whether, in the interval following the rendering of the judgment of removal, the petitioner has become a proper person to hold such office." *Meyerson,* 190 Md. at 677, 59 A.2d at 491, (quoting *In re Keenan,* 310 Mass. 166, 170, 37 N.E.2d 516, 519 (1941)). Reinstatement follows only when the applicant has demonstrated, through clear and convincing evidence of his conduct over a period of time, that he has been rehabilitated and is legally competent. *Murray,* 316 Md. at 305, 558 A.2d at 711 (citing *Barton II,* 291 Md. at 67, 432 A.2d at 1338).

■ To assist the Court in making its determination of whether a petition for reinstatement should be granted, whether reinstatement is warranted, this Court has identified the essential factors to be considered and evaluated by the Court. *Braverman,* 271 Md. at 199–200, 316 A.2d at 247; *see Murray,* 316 Md. at 305, 558 A.2d at 711; *In re Barton,* 273 Md. 377, 381, 329 A.2d 102, 105 (1974) (*Barton I* ). They are:

"1. The nature and circumstances of petitioner's original misconduct.

"2. Petitioner's subsequent conduct and reformation.

"3. His or her present character.

"4. His or her present qualifications and competence to practice law."

*Braverman,* 271 Md. at 199–200, 316 A.2d at 247. We have, in addition, codified these factors in our Rules. *See* Maryland Rule 16–781, which, as relevant, provides:

(g) Criteria for reinstatement. The Court of Appeals shall consider the nature and circumstances of the petitioner's original conduct, the petitioner's subsequent conduct and reformation, the petitioner's current character, and the petitioner's current qualifications and competence to practice law. The Court may order reinstatement if the petitioner meets each of the following criteria or presents sufficient reasons why the petitioner should nonetheless be reinstated:

"(1) The petitioner has complied in all respects with the provisions of Rule 16–760 and with the terms and conditions of prior disciplinary or remedial orders;

"(2) The petitioner has not engaged or attempted or offered to engage in the unauthorized practice of law and has not engaged in any other professional misconduct during the period of suspension, disbarment, or inactive status;

\*   \*   \*

"(4) If the petitioner was disbarred or suspended, the petitioner recognizes the wrongfulness and seriousness of the professional misconduct for which discipline was imposed;

"(5) The petitioner has not engaged in any other professional misconduct since the imposition of discipline;

"(6) The petitioner currently has the requisite honesty and integrity to practice law;

\*   \*   \*

"(8) The petitioner has paid all sums previously assessed by the order of the Court of Appeals."

■■■■ Consideration of these factors is necessary, we have explained, "to reduce the margin of risk," *Barton II*, 291 Md. at 64, 432 A.2d at 1336, thereby promoting, and improving, the probability that "the public can rely on the competence and integrity of the previously disbarred attorney." *Murray*, 316 Md. at 305, 558 A.2d at 711; *Barton I*, 273 Md. at 381, 329 A.2d at 105. Nevertheless, as we assess these factors, we remain mindful that "the more serious the original misconduct was, the heavier is the burden to prove present fitness for readmission to the bar." *Barton I*, 273 Md. at 380, 329 A.2d at 104. Before addressing these factors, however, we shall review the facts underlying the petitioner's disbarment and motivating his reinstatement request as well as the effect of the reversal of the convictions on the consent to disbarment.

On or about December 8, 2004, in the Superior Court of California, Kern County, a jury convicted the petitioner and

his co-defendant, Bobbie Cumberworth, of criminal conspiracy,[4] grand theft,[5] and commercial bribery.[6] Each was sen-

---

4. Cal. Pen.Code § 182, subd. (a)(1) provided:
   "(a) If two or more persons conspire:
     "(1) To commit any crime.

            \*     \*     \*

   "When they conspire to commit any crime against the person of any official specified in paragraph (6), they are guilty of a felony and are punishable by imprisonment in the state prison for five, seven, or nine years.
   "When they conspire to commit any other felony, they shall be punishable in the same manner and to the same extent as is provided for the punishment of that felony. If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony the defendant conspired to commit. If the degree is not so determined, the punishment for conspiracy to commit the felony shall be that prescribed for the lesser degree, except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree.
   "If the felony is conspiracy to commit two or more felonies which have different punishments and the commission of those felonies constitute but one offense of conspiracy, the penalty shall be that prescribed for the felony which has the greater maximum term.
   "When they conspire to do an act described in paragraph (4), they shall be punishable by imprisonment in the state prison, or by imprisonment in the county jail for not more than one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both that imprisonment and fine.
   "When they conspire to do any of the other acts described in this section, they shall be punishable by imprisonment in the county jail for not more than one year, or in the state prison, or by a fine not exceeding ten thousand dollars ($10,000), or by both that imprisonment and fine. When they receive a felony conviction for conspiring to commit identity theft, as defined in Section 530.5, the court may impose a fine of up to twenty-five thousand dollars ($25,000)."
   The conspiracy the State alleged was one to commit grand theft and/or commercial burglary.

5. Cal. Pen.Code § 487, subd. (a) provided:
   "Grand theft is theft committed in any of the following cases:
   "(a) When the money, labor, or real or personal property taken is of a value exceeding nine hundred fifty dollars ($950), except as provided in subdivision (b).
   "(b) Notwithstanding subdivision (a), grand theft is committed in any of the following cases:
     "(1)(A) When domestic fowls, avocados, olives, citrus or deciduous fruits, other fruits, vegetables, nuts, artichokes, or other farm crops are taken of a value exceeding two hundred fifty dollars ($250).

tenced to five years' probation, with a conditional one-year jail term suspended. To avoid the one-year jail sentence, the petitioner and his co-defendant were required to pay restitution. *People v. Cumberworth,* No. F047243, 2006 WL 3549939

> "(B) For the purposes of establishing that the value of domestic fowls, avocados, olives, citrus or deciduous fruits, other fruits, vegetables, nuts, artichokes, or other farm crops under this paragraph exceeds two hundred fifty dollars ($250), that value may be shown by the presentation of credible evidence which establishes that on the day of the theft domestic fowls, avocados, olives, citrus or deciduous fruits, other fruits, vegetables, nuts, artichokes, or other farm crops of the same variety and weight exceeded two hundred fifty dollars ($250) in wholesale value.
>
> "(2) When fish, shellfish, mollusks, crustaceans, kelp, algae, or other aquacultural products are taken from a commercial or research operation which is producing that product, of a value exceeding two hundred fifty dollars ($250).
>
> "(3) Where the money, labor, or real or personal property is taken by a servant, agent, or employee from his or her principal or employer and aggregates nine hundred fifty dollars ($950) or more in any 12 consecutive month period."

6. Cal. Pen.Code § 641.3 provided:

> "(a) Any employee who solicits, accepts, or agrees to accept money or any thing of value from a person other than his or her employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person, and any person who offers or gives an employee money or any thing of value under those circumstances, is guilty of commercial bribery.
>
> "(b) This section does not apply where the amount of money or monetary worth of the thing of value is two hundred fifty dollars ($250) or less.
>
> "(c) Commercial bribery is punishable by imprisonment in the county jail for not more than one year if the amount of the bribe is one thousand dollars ($1,000) or less, or by imprisonment in the county jail, or in the state prison for 16 months, or two or three years if the amount of the bribe exceeds one thousand dollars ($1,000).
>
> "(d) For purposes of this section:
>
> "(1) 'Employee' means an officer, director, agent, trustee, partner, or employee.
>
> (2) 'Employer' means a corporation, association, organization, trust, partnership, or sole proprietorship.
>
> "(3) 'Corruptly' means that the person specifically intends to injure or defraud (A) his or her employer, (B) the employer of the person to whom he or she offers, gives, or agrees to give the money or a thing of value, (C) the employer of the person from whom he or she requests, receives, or agrees to receive the money or a thing of value, or (D) a competitor of any such employer."

at *1, 2006 Cal.App. Unpub. LEXIS 11142 at *1 (Cal.Ct.App. Dec. 11, 2006).

Because neither defendant disputed receiving the payments alleged to constitute the theft and bribery, the contested issues at trial were whether the petitioner's co-defendant provided services to Desert Counseling Clinic ("DCC"),[7] the alleged victim of the fraud, and whether they, or either of them, had the specific intent to commit the crimes with which they were charged. As to these issues, the jury was instructed that the defendants could not be found guilty "if they acted in ignorance or in the honest belief that certain facts existed, or if they had a good faith belief that he or she had a right to the money received from DCC." *Id.* at *19, 2006 Cal.App. Unpub. LEXIS 11142, at *55. To be sure, the State made much of the secrecy with which the transaction was conducted and "the obvious appearance of impropriety produced by the transfer of funds to Cooke and then back to Terence [Cumberworth, the co-defendant's husband] and Bobbie [Cumberworth, the co-defendant]." *Id.* But the State also offered evidence, admitted by the court, over the defendants' objections, of a prior bad act [8] by the petitioner, that his co-defendant asserted both her Fifth Amendment privilege against self incrimination and the spousal communications privilege before the Grand Jury, and of misdeeds, committed by the co-defendant's husband, unrelated to the crimes on trial. The State also was permitted to argue facts not in evidence. The defendants countered, as reported by the intermediate appellate court:

---

**7.** Desert Counseling Clinic, of which Terence Cumberworth, Petitioner's codefendant's husband, was the chief executive officer, was a nonprofit corporation that provided mental health services throughout Kern County pursuant to contracts it had with the county. *People v. Cumberworth*, No. F047243, 2006 WL 3549939 at *1, 2006 Cal.App. Unpub. LEXIS 11142 at *3 (Cal.Ct.App. Dec. 11, 2006).

**8.** As reported by the California Court of Appeal, the evidence was that the petitioner settled a lawsuit, alleging that he forged initials on a document. *Id.* at *2–3, 2006 Cal.App. Unpub. LEXIS 11142, at *8. The trial court also permitted the State to argue that the petitioner committed forgery.

"Both argued that there was no intent to defraud DCC. Cooke emphasized that he earned the money he was paid by DCC, and he believed Bobbie was earning the money he was paying her. Bobbie testified that she performed work for DCC under the direction of her husband, Terence. She accepted the money she was paid because she believed she earned it. Several witnesses testified to Terence's dynamic personality and his tendency to keep information to himself. This combination led Cooke and Bobbie to believe the arrangement was above board."

*Id.* But they were also concerned that certain of the trial court's evidentiary rulings improperly and unfairly undermined their testimony and their credibility. Their appeal, therefore, challenged the propriety and correctness of these evidentiary rulings.

Following the petitioner's conviction and while the petitioner's appeal was pending, referencing those judgments of conviction,[9] the Commission and the petitioner filed a Joint Petition For Disbarment. Subsequently, pursuant to Maryland Rule 16–772,[10] the petitioner consented to being disbarred

---

9. The Commission, through Bar Counsel, could have proceeded pursuant to Maryland Rule 16–771, *supra*, note 2. Accordingly, Bar Counsel could have filed in this Court a Petition for Disciplinary or Remedial Action, attaching to it, as required by 16–771(b), a certified copy of the judgment of conviction, "prima facie evidence of the fact that [the petitioner] was convicted of the crime charged," seeking the petitioner's immediate suspension from the practice of law. Suspension, "until final disposition of the disciplinary or remedial action," would be ordered if the Court determined that the attorney had been convicted of a serious crime. In that event, however, the suspension would have had to have been vacated and the suspension terminated "if the conviction [was] reversed or vacated at any stage of appellate or collateral review."

There is no record of the Commission having so proceeded, and, moreover, given the time period here involved, it is unlikely that it would have. The petitioner was convicted January 9, 2005 and the Joint Petition was signed April 28, 2005.

10. Maryland Rule 16–772 permits an attorney to "consent to discipline or inactive status." Subsection (a). Rule 16–772(b) provides:

"(b) *Consent to discipline for misconduct.*

from the practice of law [11] and, premised on the proposition that the conduct resulting in the convictions was "criminal conduct adversely reflecting on his dishonesty, [t]rustworthiness and fitness as a lawyer, in violation of Rule of 8.4(c) [12] of the Maryland Rules of Professional Conduct," the petitioner

---

"(1) Joint petition. An attorney may consent to disbarment or other discipline by joining with Bar Counsel in a petition for an order disbarring the attorney, suspending the attorney from the practice of law, or reprimanding the attorney. The petition shall be signed by the attorney and Bar Counsel and filed in the Court of Appeals. If a suspension is requested, the petition shall state whether the suspension should be indefinite or for a stated period and shall set forth any conditions that the parties agree should be imposed. If a reprimand is requested, the petition shall state the proposed text of the reprimand and any conditions.

"(2) Affidavit required. A joint petition filed under subsection (b)(1) of this Rule shall be accompanied by an affidavit by the attorney that certifies that the attorney:

"(A) is aware that an investigation or proceeding is currently pending involving allegations of professional misconduct, the nature of which shall be specifically set forth;

"(B) knows that if a hearing were to be held, sufficient evidence could be produced to sustain the allegations of misconduct;

"(C) consents to the disbarment or other discipline stated in the petition;

"(D) gives the consent freely and voluntarily without coercion or duress;

"(E) is aware of the effects of the disbarment or other discipline to which the attorney is consenting; and

"(F) agrees to comply with Rule 16–760 and any conditions stated in the petition that the Court of Appeals may impose.

"(3) Order of the Court of Appeals. Upon the filing of the joint petition and the affidavit, the Court of Appeals may enter an order, signed by the Chief Judge or a judge designated by the Chief Judge, disbarring the attorney by consent from the practice of law in the State, suspending the attorney by consent from the practice of law, or reprimanding the attorney by consent and imposing any conditions stated in the petition. The provisions of Rule 16–760 apply to an order entered under this subsection."

11. Given the petitioner's consent to disbarment, Bar Counsel was not required to conduct an independent investigation of the facts and circumstances surrounding Cooke's charges. Maryland Rule 16–771(e)(2)(A). Such an investigation would have been premature at that stage, even if the petitioner had not consented.

12. Rule 8.4(c) prohibits a lawyer from "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation."

was disbarred.[13] *Attorney Griev. Comm'n v. Cooke,* 386 Md. 504, 872 A.2d 989 (2005). The petitioner described the conduct he characterized as "criminal" as "involv[ing] Respondent paying $57, 000 over a two-year period to the wife of the chief executive officer of Desert Counseling Clinic, while Respondent was employed as the Clinic's attorney." In addition, the petitioner averred, "Respondent submits this consent to disbarment because he knows that if a hearing was to be held, sufficient evidence could be produced to sustain the allegations of misconduct." The Joint Petition also stated, as required by Rule 16–772(b):

> "Bar Counsel and Respondent, through his counsel, have conferred on an appropriate disposition and have agreed that Respondent should be disbarred.
>
> "Respondent's consent to disbarment is freely and voluntarily rendered, pursuant to the provisions of Maryland rule 16–772(b)(1) and is not being subject to coercion or duress.
>
> "Respondent is fully aware of the implications of submitting his consent to disbarment."

■ In December 2006, the California Court of Appeal reversed the petitioner's convictions and those of his co-defendant, citing several evidentiary violations, *see Cumberworth,* 2006 WL 3549939 at *1, 2006 Cal.App. Unpub. LEXIS 11142 at *2, and, subsequently, the State of California dismissed the case against the two defendants.[14] The petitioner

---

13. The Court Order cites, as its authority, Maryland Rule 16–773(d). Rule 16–773(d), however, governs "Reciprocal discipline or inactive status:"

    "(d) *Temporary suspension of attorney.* When the petition and disciplinary or remedial order demonstrate that an attorney has been disbarred or is currently suspended from practice by final order of a court in another jurisdiction, the Court of Appeals may enter an order, effective immediately, suspending the attorney from the practice of law, pending further order of Court. The provisions of Rule 16–760 apply to an order suspending an attorney under this section."

    The Joint Petition for disbarment did not demonstrate that the petitioner is or ever was a licensed attorney in California or any other State, which had disbarred him subsequent to the California convictions. Rule 16–773(d), therefore, does not apply.

14. Petitioner offers as an Exhibit the transcript of the proceedings, dated March 7, 2002, in the Superior Court for the State of California,

petitioned this Court for reinstatement to the Bar of Maryland, by filing a *Verified Petition for Reinstatement.* In addition to noting the reversal of his conviction, which he characterized as the "sole ground for the consensual disbarment," the dismissal of the underlying charges and Bar Counsel's response to his petition, that "the Petition should be granted," the petitioner offered evidence which he believes demonstrates a "clear and convincing showing of rehabilitation and of legal competence, borne out by ... [his or her] conduct over a long period of time ..." *Barton II,* 291 Md. at 67, 432 A.2d at 1338. At the initial oral argument of the case, the petitioner acknowledged that consent was not a *quid pro quo* for reinstatement; however, he offered the rationale underlying Maryland Rule 16–771(c), which requires reinstatement when the conviction on which the suspension was premised has been reversed, by way of analogy, as a basis for reinstatement.[15] At reargument, as indicated, he stressed the latter point more, but did not abandon his argument that he had rehabilitated himself and presently is fit to return to the practice of law. In particular, his counsel stated: "There is no pigeonhole in my view that fits perfectly Mr. Cooke," but, then, analogizing to Rule 16–771, argued that, had the petitioner agreed to an immediate suspension, which would have amounted to "exactly the same thing" as consenting to disbarment, insofar as his right to practice law is concerned, section (c) of the rule would have required the lifting of the suspension once the conviction was overturned. Thus characterizing

---

Kern County. On page 3 of the transcript, lines 8–11, the prosecutor states on the record:

"People move to dismiss this case. We decided not to retry the case as to either defendant, and the defendants have each agreed in exchange to waive any claim that they may have had to recover restitution of the payments made in this case."

**15.** Clearly, Rule 16–771(c) has no applicability to disbarments and definitely not those to which consent has been given. As the Rule's caption makes clear, by using the adjective "temporary," suspension is a sanction meant to be transient in nature. It is not surprising, therefore, that the Rule contemplates circumstances that will terminate or lift the suspension. What is also clear is that the Rule's sole focus on suspension necessarily excludes disbarment from its ambit.

himself as a person "similarly situated," the petitioner maintains that this Court should, for that reason, terminate his disbarment. He submits that the Rule surely did not intend to treat dispositions, imposed based on the same predicate act, a conviction, differently simply because one resulted from an agreement to a suspension and the other was a consent to disbarment. In both cases, he points out, it was the conviction that was critical to the disposition; in the case of the consent to disbarment, it, not the agreed upon set of facts, formed the basis of the consent. To the Court's concern that, although the convictions were reversed, the evidence was not found to be insufficient to support the charges, the petitioner offered, the State of California realized the "crimes" for which the petitioner was originally convicted were not so heinous or did not exist at all.

We turn to the question that confronts us, given the facts and circumstances presented, whether the petitioner has satisfied the standard we have established for reinstatement, and whether he has demonstrated his fitness to return to the practice of law. There is, in this case, a threshold issue, whether the reversal of a conviction that preceded the consent to disbarment and was, at least a basis for the consent and disbarment, followed by the dismissal of the underlying charges, when those charges are not further pursued in disciplinary or other related proceedings, vitiate the disbarment or require the petitioner's reinstatement. If they do not, a further question is whether they, in combination with the petitioner's subsequent conduct, enhance or otherwise buttress the petitioner's case for reinstatement. If it is the latter, similar to the analysis we applied in *Murray, see* 316 Md. at 306, n. 1, 558 A.2d at 711, n. 1, we will focus on only the first three factors: (1) nature and circumstances of the original misconduct; (2) petitioner's subsequent conduct and reformation; and (3) his present character. The petitioner was not disbarred for legal incompetence, and his case certainly does not raise the same issue of competence to practice that was present in *Braverman,* 271 Md. at 203–204, 316 A.2d at 249–

250, where, unlike here, there had been decades between disbarment and the application for reinstatement.

## II. Nature and Circumstances of the Original Misconduct

As we have seen, prior to the petitioner's consensual disbarment, the petitioner, as he acknowledges and admitted in the Joint Petition for Disbarment, had been convicted of criminal conspiracy, grand theft, and bribery. That fact is significant for the purposes of the Maryland Disciplinary Rules. With knowledge of that predicate fact, confirmed by a certified copy of the judgment of conviction, the Commission was authorized to initiate disciplinary proceedings, Maryland Rule 16–771(b), and seek the petitioner's immediate suspension from the practice of law. Maryland Rule 16–771(c). Those convictions also formed a predicate for the petitioner's consent to disbarment, as the Commission's knowledge of them precipitated the investigation which resulted in the filing of the Joint Petition, of which the petitioner necessarily and undoubtedly was aware.[16] As already noted, this case proceeded by way of consent. Accordingly, there was no occa-

---

**16.** It is, therefore, not correct to say that the "sole ground for the consensual disbarment" was the convictions. That the disbarment was consensual requires us to evaluate it in view of the Rule pursuant to which it was consented. Maryland Rule 16–772, unlike Maryland Rule 16–771(c), does not rely on the fact of a conviction as evidence, prima facie or otherwise, that the attorney engaged in misconduct justifying discipline. Rather, the onus is on the attorney to satisfy the Court that it should accept his or her consent. Thus, the attorney is required to acknowledge, quite apart from the fact that the attorney has been convicted, that "sufficient evidence could be produced to sustain the allegations of misconduct;" the consent is given "freely and voluntarily without coercion or duress;" and he or she "is aware of the effects of the disbarment." Consequently, although, undoubtedly, the consent factored in the fact that a jury had convicted him of the offenses of which he was charged, the very terms of the Rule undermine any contention that the petitioner's consent was conditioned "solely" on the convictions.

Where circumstances clearly permit an inference of corrupt intent, bribery may be deemed to be conduct involving moral turpitude so as to justify disbarment of an attorney in the absence of compelling circumstances justifying a lesser sanction. *Attorney Griev. Comm'n v. Spector,* 293 Md. 324, 443 A.2d 965 (1982).

sion, nor need, for the Commission to develop the facts, as
Maryland Rule 16–771(e)(2)(A) [17] would have permitted it to do
at the appropriate time, beyond what was in the California
court's case file and what was agreed to. And, of course, the
appellate court opinion was not issued until after the disbar-
ment order had been filed.

In its opinion, the California Court of Appeal, the intermedi-
ate appellate court to which the petitioner and his co-defen-
dant appealed the judgments of conviction, described the facts,
events and circumstances, unaffected by the numerous eviden-
tiary errors the trial court was found to have committed,
surrounding, and leading to, the convictions (footnotes omit-
ted):

> "Each of the three crimes for which Cooke and Bobbie were
> convicted arose out of the same relationship. The victim of
> each crime was Desert Counseling Clinic (DCC). DCC was
> a nonprofit corporation that provided mental health services
> throughout Kern County pursuant to contracts it had with
> the county.

---

**17.** Maryland Rule 16–771(e) provides:

"Further proceedings on petition. When a petition filed pursuant to
section (b) of this Rule alleges the conviction of a serious crime, the
Court of Appeals may enter an order designating a judge pursuant to
Rule 16–752 to hold a hearing in accordance with Rule 16–757.
"(1) No appeal of conviction. If the attorney does not appeal the
conviction, the hearing shall be held within a reasonable time after
the time for appeal has expired.
"(2) Appeal of conviction. If the attorney appeals the conviction,
the hearing shall be delayed, except as provided in section (f), until
the completion of appellate review.
"(A) If, after completion of appellate review, the conviction is
reversed or vacated, the judge to whom the action is assigned shall
either dismiss the petition or hear the action on the basis of
evidence other than the conviction.
(B) If, after the completion of appellate review, the conviction is
not reversed or vacated, the hearing shall be held within a reason-
able time after the mandate is issued.
"(3) Effect of incarceration. If the attorney is incarcerated as a
result of the conviction, the hearing shall be delayed until the
termination of incarceration unless the attorney requests an earlier
hearing and makes all arrangements (including financial arrange-
ments) to attend the hearing or waives the right to attend."

"Terence [Cumberworth] was the chief executive officer of DCC. The evidence suggested he viewed DCC as his own company. He bragged that he hand picked the board of directors and could control them. Terence and some of the board members also had joint business ventures that were separate from, but related to, DCC.

"Terence could not drive because legally he was blind, but he could read correspondence if it were printed in a large font.

"Bobbie was Terence's wife. She is the mother of seven children and taught special education classes for Kern County. She quit her job with Kern County shortly before her relationship with Cooke began.

"Cooke was a lawyer and registered lobbyist in Maryland. He met Terence through one of his clients.

"Terence had grandiose plans for the expansion of DCC. In 1999 he hired Cooke to assist DCC in obtaining government contracts in Maryland. The relationship between Cooke and DCC continued until May 2002. DCC explored several business opportunities in Maryland. Cooke was involved in numerous meetings and discussions. Except for a single small contract, none of the possibilities came to fruition.

"Cooke initially was paid on an hourly basis for the services he provided. In May 2000, Terence proposed that DCC pay Cooke an annual retainer for his services in monthly install-ments of $5,000. In return, Terence proposed that Cooke hire Bobbie as an independent contractor at the rate of $2,500 per month. Bobbie, in turn, would provide services to DCC in California. Cooke would retain $2,500 per month for the services he provided DCC. Cooke accepted the offer.

"Cooke met Bobbie during his dealings with Terence before he (Terence) made the above offer. Cooke found Bobbie to be knowledgeable in the area of special education, an area into which DCC hoped to expand. When Terence made the above offer, he told Cooke that Bobbie was his 'arms and legs in California.' Cooke did not question Terence because he had worked with Bobbie and he trusted Terence. Cooke

also believed DCC intended to set up programs in California similar to programs in Maryland that Cooke had shown to Terence that involved juveniles with special needs.

"The arrangement between Cooke, Terence, and Bobbie continued for two years. Throughout this time DCC had serious financial problems, often struggling to meet payroll and pay vendors.

"In May 2002, Kern County began an audit of DCC. The primary focus of the audit was to determine if the monies paid by Kern County to DCC were used in a manner consistent with the contracts and various state and federal requirements. In other words, the question was whether DCC used the money received from Kern County on the programs it operated in Kern County. By September 2002, Kern County cancelled its contract with DCC and stopped all payments. DCC ceased operations shortly thereafter.

"The payments to Cooke and Bobbie came to light during the subsequent criminal investigation. Count one of the indictment alleged that Bobbie and Cooke conspired with Terence to commit grand theft and/or commercial bribery. Count two alleged that Cooke and Bobbie committed grand theft, while count three alleged they committed commercial bribery. Each count also alleged as an enhancement that the value of the property taken exceeded $50,000 pursuant to section 12022.6, subdivision (a)(1).

*Cumberworth,* 2006 WL 3549939 at *1-2, 2006 Cal.App. Unpub. LEXIS 11142 at *3-6.

These facts were sufficient to create a jury question as to the petitioner's guilt of the charges alleged. The petitioner and his co-defendant did not dispute the State's evidence regarding either the payment arrangement or that the payments were received. Indeed, the facts, as presented by the State, were largely conceded. The area of disagreement related to the intent with which the defendants acted. That, in fact, was the issue the jury had to decide, whether the defendants acted with the intent to defraud DCC. As to that, there was, to be sure, no direct evidence of the defendants'

intent. To prove their intent, the State emphasized that the arrangement between the defendants and DCC was secretive and the manner in which the payments were structured: they were made to the petitioner, who then paid a portion, one half of what he was paid, to his co-defendant, the wife of the Director of DCC, who negotiated the arrangement in the first instance. And the defendants maintained that they did not defraud or intend to defraud DCC, that they earned the money they were paid. From the State's evidence, divorced from the disputed and erroneous evidentiary rulings, or inferences drawable therefrom, the jury perhaps could have found that the petitioner and his co-defendant committed the charged offenses; it was not obliged to believe the petitioner, and it was free to draw the inference the State urged and wished it to.

In this case, however, the jury's findings were not divorced, or free, from the effects of the erroneous evidentiary rulings or the inferences they supported. On the contrary, as the Court of Appeal pointed out, when reversing the defendants' convictions:

"The prosecutor's job ... was eased considerably by the trial court's evidentiary rulings. Because the trial court admitted the evidence about the lawsuit in which Cooke was involved, the prosecutor argued that Cooke had a propensity to commit bad acts, and this scheme was merely another example of his character. The trial court's comments after Cooke's objection to this line of argument served only to emphasize the prosecutor's remarks.

"Because the trial court permitted the prosecutor to introduce evidence of [the co-defendant's husband's] abuses of power at DCC, the jury was more likely to infer that [the co-defendant], his wife, admitted her guilt when she invoked her Fifth Amendment right against self-incrimination. The introduction of [her husband's] abuses also cast a pall over the entire trial, creating a substantial risk of inflaming the jury's passions.

"The prosecutor's misconduct in arguing facts not in evidence invited the jury to use those 'facts' to convict [the

petitioner] and [his co-defendant] and was an obvious attempt to appeal to the jury's passions in an improper manner."

*Cumberworth,* 2006 WL 3549939 at \*19, 2006 Cal.App. Unpub. LEXIS 11142 at \*56 (footnotes omitted).

Consequently, the convictions, to which the Joint Petition referred and, to some degree, on which it was predicated, no longer exist. That, in turn, negates the impact of Maryland Rule 16–771(g).[18] There being no "final judgment," there is, and can be, no conclusive proof of the petitioner's guilt of any of the charged offenses and, therefore, no conclusive proof of the underlying conduct, which would constitute misconduct under our disciplinary rules. And, because on remand for new trial, the State of California elected not to retry the petitioner, there are no findings of fact with regard to the propriety of the petitioner's conduct, either as a matter of criminal law or ethics, as defined by the Rules of Professional Conduct.[19]

---

**18.** Maryland Rule 16–771(g) provides:

"(g) Conclusive effect of final conviction of crime. In any proceeding under this Chapter, a final judgment of any court of record convicting an attorney of a crime, whether the conviction resulted from a plea of guilty, nolo contendere, or a verdict after trial, is conclusive evidence of the guilt of the attorney of that crime. As used in this Rule, 'final judgment' means a judgment as to which all rights to direct appellate review have been exhausted. The introduction of the judgment does not preclude the Commission or Bar Counsel from introducing additional evidence or the attorney from introducing evidence or otherwise showing cause why no discipline should be imposed."

**19.** Rule 16–772, unlike Rule 16–771, does not address the situation where, after consenting to disbarment following a conviction of a qualifying crime, the disbarred attorney's conviction is reversed and, based on that reversal, the former attorney files a petition for reinstatement. Thus, it is not clear that, in that situation, Bar Counsel has the option and discretion to conduct further investigation pursuant to Maryland Rule 16–731 or request a hearing pursuant to Maryland Rule 16–757 and it is more likely that he does not. What is clear is that, in this case, Bar Counsel was fully aware of the California proceedings and was privy to the appellate opinion. Having read that opinion, he could have determined that the intent to defraud could, and should have, been pursued. In that event, he could have, and would have, opposed the petitioner's reinstatement. Bar Counsel did not do so.

This is significant with regard to the nature of the misconduct. As a result of the reversal of the convictions, the facts found by the jury or the findings it made as to the enhancements are not binding and certainly not conclusive. Despite this lack of conclusiveness with respect to the underlying conduct, we do know that the bare factual basis of Petitioner's conduct, his payments to the wife of the DCC Director, were undisputed during trial and, thus, remain so. The inference sought to be drawn from them, criminal intent, however, as the reversal of the convictions attests, was not conclusively proven, and, in fact, on remand, the State of California, having been deprived of the use of the illegally admitted evidence, opted not to go forward with a trial in order to prove this intent. The State of California's refusal to go forward may be interpreted as a concession that it lacked sufficient evidence to prove intent, although the Court of Appeal, at least in respect to co-defendant Bobbie, did not preclude the prosecution from retrying the commercial bribery charge, rejecting her double jeopardy and lack of substantial evidence arguments. *Id.* at *20, *21–22, 2006 Cal.App. Unpub. LEXIS 11142, at *57, *62. Thus, California's failure to prosecute the petitioner is important to our conclusion regarding the nature of the misconduct. We must conclude that, once the illegal evidence had been excised from the petitioner's case and California elected not to retry the petitioner, there was no evidentiary basis for concluding that the petitioner engaged in criminal misconduct.

On the other hand and nevertheless, although the lack of any fact-finding provides no basis for either aggravating or mitigating the conduct, we also must conclude that the petitioner engaged in the misconduct that he admitted when he joined in the Joint Petition For Disbarment. As we shall discuss, *infra,* what the petitioner admitted depends upon how that Petition is interpreted.

The gap in the record would be even more significant, as dismissal of the disciplinary proceedings and the consequent

---

Instead, he proffered that the petitioner's petition should be granted, effectively recommending his reinstatement.

reinstatement of the petitioner may well have been required, were this a disbarment imposed after proceedings pursuant to Maryland Rule 16–771, had not the petitioner consented to disbarment pursuant to Rule 16–772. Under Rule 16–771, as we have seen, Bar Counsel "may file" disciplinary proceedings against an attorney who has been convicted of a serious crime, even though the convictions are pending on appeal and, attaching a certified copy of the judgment of conviction, request that he or she be immediately suspended from the practice of law, subsection (b), in response to which the Court may designate a judge to conduct the hearing required by Maryland Rule 16–757(a). If the conviction is reversed or vacated, the action either shall be dismissed or proceed "on the basis of evidence other than the conviction." Maryland Rule 16–771(e)(2)(A). Thus, in Rule 16–771 proceedings, where, as here, the convictions are reversed and no new criminal proceedings remain, dismissal of the proceedings, and, therefore reinstatement, will follow.[20] It was this scenario, analogized to the consent to

---

**20.** The case of former Governor Marvin Mandel is both illustrative and instructive. Governor Mandel was convicted, by a jury, in the United States District Court of Maryland, of multiple counts of mail fraud and racketeering. *Attorney Griev. Comm'n v. Mandel*, 294 Md. 560, 563, 451 A.2d 910, 911 (1982). The mail fraud counts charged that Mandel and his co-defendants: "devised and intended to devise a scheme and artifice: (a) [t]o defraud the citizens of the State of Maryland … of their right to the conscientious, loyal, faithful, disinterested and unbiased services, actions and performance of official duties of Marvin Mandel, in his official capacities [sic] as Governor … free from bribery, corruption, partiality, willful omission, bias, dishonesty, deceit, official misconduct and fraud[.]" *United States v. Mandel*, 862 F.2d 1067, 1069 (4th Cir.1988). Following his conviction, Bar Counsel filed in this Court, pursuant to Maryland Rule BV 16, the predecessor of Rule 16–771, disciplinary proceedings, in which he sought, inter alia, Governor Mandel's immediate suspension from the practice of law. Mandel was immediately suspended. Thereafter, his convictions were affirmed by the Court of Appeals for the Fourth Circuit, *Attorney Griev. Comm'n v. Mandel*, 294 Md. at 563, 451 A.2d at 911 (internal citations omitted), whereupon, after contested proceedings, this Court ordered his disbarment. *Id.* at 588, 451 A.2d at 923.

Nearly a decade after Mandel's conviction and more than five years after he had fully served his sentence, the Supreme Court held that the mail fraud statute, 18 U.S.C. § 1341, did not protect against schemes to defraud persons of their intangible rights such as the right to honest

government. *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292, 55 U.S.L.W. 5011 (1987). Relying on *McNally*, Mandel and his codefendants filed, in the federal district court in Maryland, petitions for writs of error *coram nobis* to vacate their convictions. *See United States v. Mandel*, 672 F.Supp. 864 (D.Md.1987). The court granted the writ, holding that the decision in *McNally*, together with the nonexistence of any federal common law of crimes, made it clear that intangible rights to good and honest government may not be the target of a criminal scheme to defraud under the federal mail fraud statute. *Id.* at 876. The Court of Appeals for the Fourth Circuit affirmed, concluding, "this case is indistinguishable from *McNally*, and, thus, the petitioners here were convicted for conduct we now know is 'not within reach of [the mail fraud statute].' " *United States v. Mandel*, 862 F.2d at 1072. Further, the Court held that "[s]ince none of the underlying offenses of mail fraud remain[ed] viable after *McNally*, the racketeering convictions ... also must be vacated." *Id.* at 1074. *See United States v. Truglio*, 731 F.2d 1123, 1132 (4th Cir.1984), *cert. denied*, 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 130 (1984).

Mandel was reinstated to the practice of law in Maryland in 1989. Though he first petitioned this Court in 1987 solely based on personal rehabilitative factors, as this was before the *McNally* decision and his conviction *vacatur*, Mandel filed an *Amended Petition for Reinstatement—Request for Immediate Reinstatement* in 1989, which stated, in part:

"[T]he Court of Appeals ordered him disbarred based solely upon the federal conviction ... Now, the federal conviction upon which Petitioner was disbarred has been vacated and set aside by the United States District Court for the District of Maryland ... the United States Court of Appeals for the Fourth Circuit affirmed.

\*   \*   \*

"[B]ecause the conviction upon which Mandel's disbarment was based has been vacated, there is no conviction and, consequently, no valid disbarment. With the predicate for disbarment having been set aside, Mandel is not properly disbarred and is entitled to immediate reinstatement to the Bar of this Court."

(Internal citations omitted).

Mandel never consented to disbarment; following disciplinary proceedings, he was ordered disbarred as a result of his convictions. Mandel filed his amended petition for immediate reinstatement on June 26, 1989; Bar Counsel filed a response on June 28, 1989, and Mandel was ordered reinstated on June 29, 1989.

As we said, our handling of Mandel's case is illustrative and instructive. Mandel's disbarment was based upon convictions for conduct that was later determined not to be criminal. Thus, once the convictions were reversed on the merits, there was no basis for—nothing to support—the disbarment. Here, we do not have that situation: the disbarment in this case was based on conduct, resulting in convictions, that was, if proven, criminal. Therefore, the reversal of the convictions did not mean that the petitioner did not engage in the conduct and, certainly, did not necessarily render the conduct underlying them noncriminal. Nor did the State of California's decision not to retry the petitioner. Consequently, the petitioner's disbarment is not vitiated

disbarment scenario, that Bar Counsel had in mind when he suggested, initially, that the reinstatement petition should be granted,[21] a position which the petitioner strongly endorsed. That is not this case.

Rather than a prophylactic step toward, but preliminary to the final resolution of, disciplinary proceedings against a lawyer, a consensual disposition is the final resolution of the proceedings. Rather than merely being a stop-gap measure that is an incremental part, albeit an important part, of the proceedings, a consensual disposition terminates the proceedings. Moreover, Rule 16–772 focuses not on convictions for crime, but on the conduct underlying the convictions. Thus, while, to be sure, he admitted that he had been convicted of three offenses, the petitioner went on to say that the conduct underlying those convictions was "criminal conduct" that, in addition, violated Rule 8.4(c). The conduct which the petitioner described as "criminal" was the payment of a sum of money, over a period of two years to his co-defendant, the wife of the Executive Director of his employer. And, he agreed the appropriate sanction for the Rule 8.4(c) violation was disbarment. As important, the petitioner stated that he was acting voluntarily, without duress, and he acknowledged that

---

automatically. The petitioner did not consent to disbarment due to a conviction for conduct which was not a crime.

21. Mandel appended to his Amended Petition For Reinstatement, the pleadings in the case of *Attorney Griev. Comm'n v. Lee G. Lovett*, BV No. 39 (Sept.1985), who consented to disbarment upon his being convicted of mail fraud. His conviction also was vacated as a result of the *McNally* case. Lovett was reinstated; Bar Counsel recommended that result based on the reversal of the conviction. To support his recommendation, Bar Counsel analogized Lovett's case to *Attorney Griev. Comm'n v. Euzent*, BV No. 6 (Sept.1979), a case involving a BV 16 Suspension, predecessor to Rule 16–771. That is the petitioner's precedent to support its argument that reinstatement, on that basis and for that reason, should be ordered in this case. That the Court accepted Bar Counsel's recommendation in *Lovett* can not be denied. But that is all it did, there is no principled analysis that requires that result.

Lovett may also be distinguished by the fact that, although he consented to disbarment, the conduct to which he admitted turned out not to be a crime, after all. In that way, it is not so very different from *Mandel*.

the Commission could establish that he engaged in the pro-scribed conduct.[22]

From the foregoing, the petitioner's own admissions and consent, viewed in the light most favorable to Bar Counsel, the Court must conclude, and we do, that the payments to his co-defendant, being in violation of Rule 8.4(c), involved dishonesty, fraud deceit or misrepresentation. This conclusion follows despite our previous conclusion that the reversal of the convictions and the decision not to retry the petitioner resulted in there being no evidentiary basis for concluding that the petitioner engaged in criminal misconduct. A Rule 8.4(c) violation is, at the least serious misconduct, which requires a serious and prompt response. *See Attorney Griev. Comm'n v. Johnson*, 409 Md. 470, 508, 976 A.2d 245, 267 (2009) (citing *Attorney Griev. Comm'n v. Siskind*, 401 Md. 41, 75, 930 A.2d 328, 348 (2007)) (Stating that acts of dishonesty, fraud, or misleading behavior may warrant a sanction of disbarment, especially where there are no mitigating factors and no reasons put forth convincing the Court why disbarment is not warranted); *Attorney Griev. Comm'n v. Vanderlinde*, 364 Md. 376, 418, 773 A.2d 463, 488 (2001) (Stating disbarment ordinarily should be the sanction for intentional dishonest conduct); *Attorney Griev. Comm'n v. Kahn*, 290 Md. 654, 431

---

22. Although our case law is clear that attorney discipline is not punishment, *Attorney Griev. Comm'n v. Snyder*, 406 Md. 21, 30–31, 956 A.2d 147, 152 (2008) (quoting *Attorney Grievance Comm'n v. Awuah*, 374 Md. 505, 526, 823 A.2d 651, 663 (2003)) (Stating the purposes of attorney discipline are "to protect the public, to deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession[ ]"), and thus is not criminal in nature, a guilty plea is an analogous pleading to a consent to disbarment. In guilty pleas, as here and as required by Rule 16-772, it is the conduct alleged and the voluntariness with which it was done that is important. *See* Maryland Rule 4–242(c); *Sutton v. State*, 289 Md. 359, 365, 424 A.2d 755, 758–59 (1981) (citing *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274, 279–80 (1969); *Davis v. State*, 278 Md. 103, 111, 361 A.2d 113, 117 (1976)) (Stating voluntariness is especially important because of the significant consequences of a guilty plea: waiving several of one's constitutional rights including the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers).

A.2d 1336 (1981) (citing *Attorney Griev. Comm'n v. Barnes,* 286 Md. 474, 408 A.2d 719 (1979)) (Stating that when an attorney is convicted of a crime of moral turpitude, disbarment follows automatically unless compelling extenuating circumstances are established). To their credit, the Commission and the petitioner made what they thought, under the circumstances, was an appropriate response.

## III. Petitioner's Subsequent Conduct and Reformation; Present Character

Following his convictions on December 8, 2004, the petitioner had to face their consequences on his professions: he was both an attorney and a registered lobbyist in the State of Maryland. Within a little more than four months, on April 28, 2005, while his appeal of the judgments was pending, he joined with Bar Counsel to file a Joint Petition for Disbarment. In that petition, he admitted engaging in conduct that was both criminal and violative of the Maryland rules of Professional Conduct and that an appropriate sanction for the conduct was disbarment, to which he consented. Moreover, he closed his law practice promptly, closed all financial accounts in an appropriate fashion, and promptly notified his clients by mail and by phone of the termination of his practice, recommending other attorneys when requested and appropriate.

Shortly after consenting to disbarment, on June 23, 2005, in response to the Maryland State Ethics Commission's complaint to revoke his lobbying registration as a result of the convictions, the petitioner entered into a public Stipulation of Settlement, in which he agreed to the revocation, a public reprimand and other sanctions.

The petitioner was sentenced to a one year term of imprisonment, which was suspended in favor of five years probation, the payment of restitution and community service. In January, 2005, rather than seek to stay the performance until after the appeal was decided, he arranged with Charles H. Mooneyhan, Executive Director of The Wells House, Inc., a State certified alcohol and drug addiction provider,[23] located in

---

23. Mr. Mooneyhan described The Wells House, as follows:

Hagerstown, Maryland, and the president of the Maryland Association of Alcohol & Drug Continuing Care Facilities (the Maryland Halfway House Association)[24] to do his community service hours at the Wells House.[25] In less than 12 months, by January 23, 2006, the petitioner had performed more than 1,000 hours, primarily as a volunteer direct care worker. The records that were sent to the court were quite detailed. They revealed that the petitioner was consistent in his performance and that he was committed to the work of the House. Indeed, on a number of occasions, he lived in overnight, acting as resident manager of the House so that the active Manager could have the night off. On one occasion, during the last week of June into the first week of July, the petitioner even stayed in residence, taking responsibility for overall supervision, to allow the executive staff to attend an out of state alcohol-related conference.

---

"Our primary program is a 35–bed residential continuing care facility for adult men, commonly referred to as a halfway house. This inpatient program deals primarily with the most difficult cases of drug addiction and alcoholism, most of whom are homeless and unemployed. In fact, many of our clients are criminal offenders recently released from area prisons and county detention centers throughout the tri-state area (Maryland, Pennsylvania & West Virginia)."

24. The petitioner, while a lobbyist and lawyer, provided pro bono service to some clients. Mr. Mooneyhan noted that, in the early 90's, the petitioner represented the Halfway House Association and provided lobbying pro bono.

25. One of the petitioner's references referred to his "very publicly reported experience with substance abuse," a probation before verdict finding in a misdemeanor marijuana case was revoked when he violated his probation. The result was the petitioner's introduction, in 1994, to the Lawyers Assistance Program of the Maryland State Bar Association and its then Director, Richard Vincent, and "his work[ ] with him and others with the disease of alcoholism." As it relates to this matter, the petitioner has written:

"I have received tremendous satisfaction and personal growth during this process. As part of my sentence in California I was required to do 1000 hours of community service in a one year period. I accomplished this by working with alcoholics and recovering addicts at the Wells House in Hagerstown."

In addition to performing the 1,000 hours of community service while his appeal was pending, the petitioner paid the restitution, as ordered, although he mortgaged his home to do so. Moreover, even though he maintains that the "financial consequences of [his] conviction and loss of savings and income has been devastating, when the convictions were overturned, the petitioner was required to forego any attempt at recovery of the restitution.

Since becoming associated with Richard Vincent and the Maryland State Bar Association Lawyer Assistance Program, the petitioner has remained abuse free and has worked with the Lawyers Assistance Program. Although he had completed his community service hours and his convictions had been, by then, reversed, without retrial, in April 2008, the petitioner expressed the desire to return to Wells House for the summer and do volunteer work. He explained:

> "This April, not being professionally very busy, I took up temporary residence in Hagerstown and began volunteering again at Wells House. As I write this letter to you, I am working four to six hours each day. Unable to practice law, I have been working with the House's clients on securing GED's, filling out employment applications, holding mock interview sessions and the like. I continue to attend meetings of a particular fellowship and drive the clients to and. from. This has allowed me to make contributions of a substantive nature."

Mr. Mooneyhan confirms:

> "Through our clients Ira met many recovering alcoholics and addicts in the local community. He also provided many of these individuals his personal advice, as well as other non-legal services. ... [S]ince his arrival in April, he has been at the Wells House a minimum of six days a week, many hours each day. As a former teacher, Mr. Cooke has tutored some of our clients and helped them prepare for their GED examinations. He has also helped some of our clients with job applications and resume preparation, as well

as providing transportation to some of these clients by driving them to job interviews and other appointments."

Since 2006, the petitioner has supported himself and his dependent minor children, of whom he has "shared custody," doing limited consulting, as executive director, for two trade associations, Sedan Transportation Association of Maryland and Greater Washington Bail Bond Association and with a New Jersey real estate development company. He describes what he does for these associations and company as "watch[ing] their properties and work[ing] with their regional managers on business matters." On December 14, 2006, three days after the Court of Appeal reversed his convictions, the petitioner's lobbying registration was restored. Pointing out that "[t]he jurisdictional basis for [its] complaint, [the] stipulation and order was the criminal conviction in California arising from [the petitioner's] lobbying activities" and noting that those convictions had been reversed, the Ethics Commission "determined to dismiss the complaint and to set aside the acceptance of the Stipulation of settlement," which it did. The petitioner reports: "I have three Annapolis clients with no expectation or desire for growth."

The petitioner's desire is to return to the practice of law, relocate to Hagerstown, and "open a small practice in which [he] can devote significant time to the representation of individuals and families disadvantaged by social conditions." He wants a local practice, he states, "divorced from either the atmosphere in Baltimore or especially Annapolis," one which will allow him "to enjoy the pleasures and tribulations of a small time and town practice."

## IV. The Disposition

Our task is to decide whether the petitioner, by clear and convincing evidence, has met his burden of demonstrating that he is entitled, fit, to be reinstated to the Bar of Maryland, that his "proof of rehabilitation over the time he has been prohibited from practicing law overcomes the proof of bad character

evidenced by his [consent to disbarment]." *Cory*, 300 Md. at 185, 477 A.2d at 273.

We addressed the nature of that decision-making in *Raimondi*, 285 Md. at 617–618, 403 A.2d at 1239–40:

"It may not have been so labeled, but what courts do when faced with any application for reinstatement from a previously disbarred lawyer is to engage in a balancing process. On one side of the scale is placed the seriousness of the misconduct which produced disbarment and the court's duty to society at large to see that only those persons who are worthy of the faith and confidence of the general public are permitted to handle the affairs of others. In this regard, it must be remembered as Chief Justice Vinson said in *In Re Isserman*, 345 U.S. 286, 289, 73 S.Ct. 676, 97 L.Ed. 1013 (1953), *reversed on other grounds*, 348 U.S. 1, 75 S.Ct. 6, 99 L.Ed. 3 (1954), 'There is no vested right in an individual to practice law. Rather there is a right in the Court to protect itself, and hence society, as an instrument of justice.' On the other side are placed the subsequent conduct and reformation of such individual, his present character, his present qualifications and competence to practice law, and the fact that the very nature of law practice places an attorney in a position where an unprincipled individual may do tremendous harm to his client. In this balancing process consideration must be given to the length of time which has elapsed since disbarment. Also, it must not be forgotten that a disbarred attorney was previously found to possess good moral character. Otherwise, he would not have been admitted to practice law. Thus, either someone erred in the earlier evaluation of his character or the weakness of character producing the earlier misconduct previously failed to manifest itself. For this reason such an applicant must undergo an even more exacting scrutiny than he did earlier. In evaluating the statements from others as to the present good moral character of an applicant for readmission it must not be forgotten that a disbarred lawyer—like many people convicted of so-called "white-collar" crime—had earlier occupied a position in society where it is probable that testi-

monials as to his good moral character, similar to that elicited in connection with his application for reinstatement, could have been obtained at any point in time prior to knowledge of his misconduct on the part of those attesting to his good character."

██ Also to be factored in the balance are whether the traits and factors which led to disbarment still exist and whether the attorney is a changed individual with a full appreciation for his mistake and a new determination to adhere to the high standards of integrity and legal competence which this Court requires. *Barton II*, 291 Md. at 64, 432 A.2d at 1336.

This is an unique case. The attorney for the petitioner has observed: "Quite candidly, no disbarment based on a conviction that was overturned on appeal, without retrial, has been uncovered." His suggestion that the disbarment can not be sustained without a conviction that precipitated it is apparently shared by Bar Counsel, as discussed previously, but logically, as we have demonstrated, does not follow. In his response to the petition, the petitioner offered that Maryland Rule 16–781(d), prescribing the information to be provided to Bar Counsel when a petition for reinstatement is filed, does not apply, "in that the reason for the Petitioner's disbarment was based on a conviction which no longer exists." Moreover, Bar Counsel responded that he "believes the Petition should be granted." [26]

The trigger for the petitioner's disbarment, his convictions by the California court, no longer exists, the convictions having been reversed and the State of California having elected not to retry them. As we have pointed out, however, the consent referenced the conduct that resulted in the convictions, not simply the convictions themselves. Thus, the continued viability of the disbarment is not solely dependent on the petitioner remaining to be convicted. Nevertheless, as we

---

**26.** Bar Counsel referenced, but did not identify, a similar petition and situation. It is conceivable that he was referring to the case of Lee G. Lovett, *supra* note 21.

have also indicated, the reversal, without retrial, and Bar Counsel's decision not to oppose the petitioner's reinstatement, and, on the contrary, to recommend it, are significant.

The consent is, at best, ambiguous as to whether the petitioner admitted the conduct underlying the convictions. To be sure, the Consent stated that "Respondent's conduct was criminal ..." and that the appropriate sanction was disbarment, however, the Consent also indicated that the petitioner was consenting to disbarment because "he knows that if a hearing was to be held, sufficient evidence could be produced to sustain the allegations of misconduct." That was clearly so when the Consent was executed: to establish the allegations, Bar Counsel would have had only to produce a certified copy of the judgment of conviction. *See* Maryland Rule 16–771(g). Once the convictions were reversed, without retrial, the situation was dramatically different. Whether the requisite proof could have been produced was, for Bar Counsel, more problematic. *See* Maryland Rule 16–771(d)(2)(A) (requiring Bar Counsel to produce evidence of misconduct where a predicate conviction has been reversed or dismiss the action). It was also a matter of discretion. Rule 16–771(e) is exemplary, it permits, it does not require, Bar Counsel to produce *other* evidence. Bar Counsel has discretion to act consistent with the circumstances as they unfold and consistent with the purposes of the Rules of Professional Conduct. This also has a bearing on the meaning of the consent. Therefore, the fact that a conviction that precipitates and is a basis for a consent to disbarment has been reversed and not retried is a consideration in the petitioner's favor when the petitioner did not admit guilt of the offenses under prosecution and his or her admission as to the underlying conduct is ambiguous.

That is this case. When the petitioner consented to disbarment, his appeal of the convictions was pending. Moreover, he never admitted guilt of the crime; he has advised, "I did not accept a plea offer in California because I could not lie and say I was guilty of a crime I did not commit." To be sure,

the Joint Petition states that the conduct resulting in the convictions was "criminal," but it also stated that the reason for the consent to disbarment was the petitioner's belief that Bar Counsel could prove that it was. The latter would not have been required had the former been intended to be an admission of guilt, not to mention that it was inconsistent with the pending appeal.

Also on the petitioner's side of the ledger is his complete and prompt cooperation with Bar Counsel. Rather than a contentious proceeding, he consented to disbarment, recognizing the state of the record at the time. He followed through with his consent by closing expeditious and appropriately his law practice.

The same pattern with regard to the State Ethics Commission is evident; rather than engaging in an adversarial proceeding, the petitioner stipulated to the withdrawal of his lobbyist registration.

That Bar Counsel recommends the petitioner's reinstatement is entitled to some weight. Rule 16–781(f) requires Bar Counsel, in response to a petition for reinstatement, to "file a response to the petition within 30 days after being served unless a different time is ordered. The response shall admit or deny the averments of the petition . . . and may include a statement of Bar Counsel's recommendations and reasons for supporting or opposing the petition." Thereafter, the Court of Appeals shall enter a disposition upon review of the petition and Bar Counsel's response, Md. Rule 16–781(h), and "[i]f the Court of Appeals orders further proceedings, the Court shall enter an order designating a judge . . . to hold a hearing. The judge shall allow reasonable time for Bar Counsel to investigate the petition[,] . . . take depositions and complete discovery." Md. Rule 16–781(i).

In its response to the petition for reinstatement and at oral argument, Bar Counsel consistently has supported the petitioner's reinstatement. He had no obligation to do so; he could have opposed the petition, which he would have done had he believed, after review of the decision reversing the

petitioner's convictions, that to be appropriate. When Bar Counsel answered the Petition, he was aware of the facts and circumstances of the petitioner's case. He knew that the facts were not disputed, only the inferences to be drawn from them. He also was aware of the very detailed opinion of the Court of Appeal and its resolution of the disputed issue of the petitioner's intent. And, of course, he was aware of the State of California's decision not to retry the petitioner. Bar Counsel may well have found that decision to be an indication that an investigation into the petitioner's intent, since the raw facts were undisputed, would prove futile. Bar Counsel also was aware of a case like this one, *see,* n. 21, in which this Court, under very similar circumstances, treated a consent to disbarment analogously to a Rule 16–771 case.

The record further reflects that the petitioner complied with the terms of his sentence, including performing community service and making the payments imposed as a condition of probation, even while the case was on appeal and despite the reversal of the convictions. Indeed, he has continued to volunteer in an area where he has experienced vulnerability; substance abuse. In the more than six years of his disbarment, the petitioner has not engaged in the unauthorized practice of law, supporting himself with a consultancy involving three companies and some limited lobbying, since his registration was reinstated. Additionally, there are letters that, by detailing the petitioner's myriad community service hours, volunteerism and commitment to public service, speak to his present moral character. *See Murray,* 316 Md. at 313, 558 A.2d at 714–15. Further, there was no testimony and no letters that even suggest a contrary view. *Compare In re Loker,* 285 Md. 645, 648, 403 A.2d 1269, 1270 (1979) (An investigation revealed petitioner's efforts subsequent to disbarment to shield his family home and wages from creditors, and such findings were indicative of insufficient reformation).

On the other side of the ledger is the consent to disbarment. The conduct it acknowledged was, as we indicated earlier, serious; however, as we also pointed out, without the convictions that it referenced and, on which, to some extent, it relied,

there is no evidence of its occurrence or that it was misconduct that would sustain the disbarment to which the petitioner consented.

We conclude that, on balance, that the petitioner should be reinstated to the practice of law. Accordingly, it is

ORDERED that Ira C. Cooke be and he is hereby reinstated as a member of the Bar of Maryland upon paying the costs of these proceedings and upon taking in open court and subscribing to the oath of attorneys required by Maryland Code (1989) (2010 Repl.Vol.), Business Occupations and Professions Article § 10–212.

BATTAGLIA, ADKINS and McDONALD, JJ., dissent.

ADKINS, J., dissenting, in which BATTAGLIA and McDONALD, JJ., join.

We are presented with Petitioner Ira C. Cooke's petition for reinstatement to the Maryland bar. This petition addresses Cooke's previous consent to disbarment, after being convicted in California of criminal conspiracy, grand theft, and commercial bribery. Cooke's conviction was overturned in 2006 by the California Court of Appeal, because of a prosecutor's improper evidentiary tactics.

The test for reinstatement under the Maryland Rules requires this Court to consider "the nature and circumstances of the petitioner's original conduct, the petitioner's subsequent conduct and reformation, the petitioner's current character, and the petitioner's current qualifications and competence to practice law." Maryland Rule 16–781(g).

I respectfully dissent because I believe the first factor in our test, "the nature and circumstances of the petitioner's original conduct," requires further information and analysis. I believe the gaps in the record and the troubling accusations levied toward Cooke do not favor his reinstatement at this time.

As the Majority correctly notes, the overturning of Cooke's conviction does not serve to completely wipe away the under-

lying reasons for his consent to disbarment. The Majority recognizes that an attorney consenting to disbarment must acknowledge, "quite apart from the fact that [he] has been convicted, that 'sufficient evidence could be produced to sustain the allegations of misconduct[.]' " [1] Maj. Op. at 671, 42 A.3d at 621 n. 16. The Majority uses this requirement of consent to "undermine any contention that the petitioner's consent was conditioned 'solely' on the convictions[,]" as Petitioner had argued. *Id.; see also id.* at 679–80, 42 A.3d at 627 n. 20 ("[T]he reversal of the convictions did not mean that the petitioner did not engage in the conduct.... Consequently, the petitioner's disbarment is not vitiated automatically. The petitioner did not consent to disbarment due to a conviction for conduct which was not a crime.").

The Majority cites the case of former governor Marvin Mandel to say that if a conviction leading to disbarment is overturned on the merits, then there is no basis to support the disbarment. *See* Maj. Op. at 678–80, 42 A.3d at 626–27 n. 20. But the Majority acknowledges that the Mandel case is different, because unlike here, Mandel did not consent to disbarment. Without the consent, there was not the required admission by Mandel that "sufficient evidence could be produced to sustain the allegations of misconduct." *See* Maryland Rule 16–772(b)(2)(B).

To be sure, had the evidentiary misconduct by the California prosecutor not occurred here, Petitioner might have never been convicted and thus never consented to this disbarment. The Majority correctly recognizes, however, that even "divorced from the disputed and erroneous evidentiary rulings, or inferences drawable therefrom" in the California trial court, a jury "could have found ... that [Cooke] committed the charged offenses[.]" Maj. Op. at 675, 42 A.3d at 624. Building on this, the Majority concludes that Cooke "engaged in the

---

1. This is required under the Maryland Rules. The attorney who consents to disbarment must certify that he or she "knows that if a hearing were to be held, sufficient evidence could be produced to sustain the allegations of misconduct[.]" *See* Maryland Rule 16–772(b)(2)(B).

misconduct that he admitted." Maj. Op. at 677, 42 A.3d at 625. Building further, and incorporating the language of Cooke's consent to disbarment,[2] the Majority concludes that Cooke's "payments to his co-defendant, being in violation of Rule 8.4(c), involved dishonesty, fraud[,] deceit[,] or misrepresentation[,]" misconduct that "requires a serious and prompt response." Maj. Op. at 681, 42 A.3d at 628. That response was Cooke's consent to disbarment.

The Rules require that any attorney's consent to disbarment contain language stating that he is "aware of the effects of the disbarment" to which he is consenting. Rule 16–772(b)(2)(E). Cooke's petition contained such language, and surely he must have understood the consequences of admitting "criminal conduct" in a consent petition, especially considering our well-established principle that "the more serious the original misconduct was, the heavier is the burden to prove present fitness for readmission to the bar." Maj. Op. at 662, 42 A.3d at 616 (*citing In re Barton*, 273 Md. 377, 380, 329 A.2d 102, 104 (1974)).

The record references additional troubling accusations against Cooke, including a forgery lawsuit, which was apparently settled by the parties. Although the California Court of Appeal held evidence of such a lawsuit inadmissible in a criminal case to impeach Cooke's credibility,[3] this Court may consider such evidence as bearing on Cooke's character and fitness to practice law. The particulars of the forgery lawsuit and other allegations of misconduct are unclear from the record before us, which does not include transcripts from the criminal trial. The Majority opinion contains no analysis or evaluation of these allegations, as required by Rule 16–781(g)(6), bearing on whether the "petitioner currently has the requisite honesty and integrity to practice law[.]" The Major-

---

**2.** Cooke's consent petition certifies that his "conduct was criminal conduct adversely reflecting on his honesty, trustworthiness, and fitness as a lawyer[.]"

**3.** *See People v. Cumberworth*, No. F047243, 2006 WL 3549939, at *2–5, 2006 Cal.App. Unpub. LEXIS 11142, at *7–16 (Cal.Ct.App. Dec. 11, 2006).

ity views the allegations rather uncritically, despite the serious implications contained therein.

Cooke's consent to disbarment precluded fact-finding proceedings here in Maryland, which further exacerbates the incomplete-record problem. As the Majority states, "the facts found by the jury or the findings it made as to the enhancements are not binding and certainly not conclusive." Maj. Op. at 677, 42 A.3d at 625. The Majority observes that the lack of fact-finding in Maryland is a major contributing factor to the lean nature of the record before this Court. *See id.* at 667, 42 A.3d at 619 n. 11 ("Bar Counsel was not required to conduct an independent investigation of the facts and circumstances surrounding Cooke's charges."); *id.* at 671–72, 42 A.3d at 622 ("Accordingly, there was no occasion, nor need, for the [Attorney Grievance] Commission to develop the facts[.]").[4]

This Court would typically endeavor to learn these kinds of facts, rather than merely lament the lean record. The Maryland Rules provide for just this sort of problem. They allow us to order "further proceedings" in the course of reviewing reinstatement petitions. *See* Maryland Rule 16–781(h).[5] I submit that this is a more appropriate course of action regarding Mr. Cooke than reinstatement on this bare record. The gaps in the record are troubling, and it is within this Court's power to order them filled. Furthermore, I believe Petitioner should provide all necessary information to Bar Counsel as listed in Maryland Rule 16–781(d). I disagree with Bar Counsel's view that those provisions are inapplicable to Petitioner. This information would include Petitioner's employment history, Petitioner's financial records, civil actions

---

4. Puzzlingly, the Majority seems to throw up its hands and disregard the consent to disbarment because "there is no evidence of . . . misconduct that would sustain the disbarment to which the petitioner consented[,]" Maj. Op. at 691, 42 A.3d at 633, despite earlier in its opinion acknowledging that Cooke "engaged in the misconduct that he admitted[,]" Maj. Op. at 677, 42 A.3d at 625.

5. In such further proceedings, Cooke would "have the burden of proving the averments of the petition [for reinstatement] by clear and convincing evidence." Maryland Rule 16–781(i).

involving the Petitioner, and "any other information that the [P]etitioner believes is relevant to determining whether the [P]etitioner possesses the character and fitness necessary for reinstatement." *See* Rule 16–781(d). Such information would be especially illuminating in this case, given the ambiguities in the record.

The Majority breezes by these record gaps as mere potholes on the road to Cooke's deserved reinstatement, but I am unpersuaded. The Maryland Rules require anyone consenting to disbarment to admit a certain degree of misconduct, irrespective of any conviction in another state. Once that admission is made, I believe it incautious to allow the reversal of a conviction—in a separate proceeding—to conclusively silence a voluntary admission of misconduct, especially when other bad acts potentially bearing on a disbarred attorney's overall character lurk in an undeveloped factual record.

For the foregoing reasons, I respectfully dissent.

Judges BATTAGLIA and McDONALD have authorized me to say that they agree with the views expressed in this opinion. Judge BATTAGLIA and I also agree with the views expressed in Judge McDONALD's dissenting opinion.

McDONALD, J., dissenting, in which BATTAGLIA and ADKINS, JJ., join.

I agree with 99% of the majority's thorough and carefully considered opinion. And I sympathize with Mr. Cooke's desire to resolve this lengthy proceeding. But, in my view, without further investigation, reinstatement is premature.

Under the rule governing reinstatements, Mr. Cooke would have the burden of proof by "clear and convincing" evidence as to the factual averments supporting his petition at any hearing concerning his petition. Maryland Rule 16–781(i). This is consistent with the requirement that an applicant for admission to the bar has the burden of proving his or her good moral character. Rule 5 of Rules Governing Admission to the Bar of Maryland.

Here the petition is based on an appellate reversal of Mr. Cooke's criminal conviction.[1] Unlike the case of an acquittal, where the factfinder (whether judge or jury) makes an affirmative determination that the evidence does not establish the crime beyond a reasonable doubt, the appellate decision did not evaluate the strength of the evidence against Mr. Cooke but rather found that prosecutorial misconduct and judicial error may have affected the jury's conclusion, beyond a reasonable doubt, that he committed the charged offenses.

While the opinion of the intermediate appellate court in California summarizes the underlying conduct of Mr. Cooke and his co-defendant, that opinion is largely focused on the miscues of the prosecutor and judge, which are independent of Mr. Cooke's conduct. What we do know from the appellate decision is that Mr. Cooke apparently entered into an agreement with the CEO of his corporate client essentially to kick back one-half his fee to the CEO's wife. There apparently was some debate at trial as to whether the CEO's wife actually performed services of benefit to the corporation. Even if she had performed such services, we do not know from the California appellate opinion what, if any, explanation was offered for the circuitous arrangement for compensating her for her services. Nor do we know whether there was any indication that this arrangement was disclosed to the nonprofit corporation's board or in its public filings with the Internal Revenue Service. An attorney with a sophisticated practice such as Mr. Cooke would surely understand the significance of such disclosure. The answers to these questions might be revealing of his capacity to carry out the fiduciary duties that attorneys must perform.

It may be that once these questions and others were properly explored and evaluated in light of the good deeds Mr. Cooke has undertaken in the intervening years—and giving

---

1. To their credit, both Mr. Cooke's counsel and Bar Counsel have acknowledged that even an attorney who has been acquitted of criminal charges may be disbarred for the conduct underlying those charges. *See Maryland State Bar Ass'n v. Frank,* 272 Md. 528, 325 A.2d 718 (1974).

him proper credit for coming forward and agreeing to disbarment in 2005 when he could have simply taken a suspension under Rule 16–772—I too would be satisfied with "time served." However, at present, the record is bare.

Judge BATTAGLIA and Judge ADKINS have indicated that they join this opinion.